# EXHIBIT "C"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, *individually and derivatively as a member of* NORTHSHORE MOTOR LEASING, LLC, JOSHUA AARONSON, *individually and derivatively as a member of* 189 SUNRISE HWY AUTO, LLC, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Case No.: 1:23-cv-6188

**COMPLAINT**

Plaintiffs,

-against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, and LIBERTAS FUNDING LLC,

Defendants.

-----------------------------------------------------------------X

Plaintiffs Superb Motors Inc., Team Auto Sales LLC, Robert Anthony Urrutia, 189 Sunrise Hwy Auto LLC, Northshore Motor Leasing, LLC, Brian Chabrier, *individually and derivatively as a member of* Northshore Motor Leasing, LLC, Joshua Aaronson, *individually and derivatively as a member of* 189 Sunrise Hwy Auto, LLC, Jory Baron, 1581 Hylan Blvd Auto LLC, 1580 Hylan Blvd Auto LLC, 1591 Hylan Blvd Auto LLC, 1632 Hylan Blvd Auto LLC, 1239 Hylan Blvd Auto LLC, 2519 Hylan Blvd Auto LLC, 76 Fisk Street Realty LLC, 446 Route 23 Auto LLC and Island Auto Management, LLC (collectively hereinafter the "Plaintiffs"), by their respective attorneys Milman Labuda Law Group PLLC and Cyruli Shanks & Zizmor LLP, as and for their Complaint against Defendants Anthony Deo, Sarah Deo, Harry Thomasson, Dwight Blankenship, Marc Meckling, Michael Laurie, Thomas Jones, CPA, Car Buyers NYC Inc., Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC, UEA Premier Motors Corp., DLA Capital Partners Inc., Jones, Little & Co., CPA'S LLP, Flushing Bank, and Libertas Funding LLC (collectively hereinafter the "Defendants"), hereby allege as follows:

## NATURE OF THE CASE

1.      Defendants have engaged in schemes to gain access to the Plaintiffs' businesses by holding themselves out as qualified to run automobile dealerships, then usurping operational control of two separate groups of dealerships to pillage and plunder them, leaving Plaintiffs holding the bag while they start a separate group of dealerships propped up by stolen assets and funds of Plaintiffs.

2.      Defendants' brazen and criminal scheme, carried out by engaging in wire fraud and the use of forged instruments, must be stopped immediately.

2

3.      Absent relief, Plaintiffs' businesses are at risk of being forced to shut down.

4.      This is an action for damages and injunctive relief related to Defendants' unlawful conspiracy and scheme to engage in wire fraud by, among other things, signing checks they had no authority to sign, opening bank accounts by providing false and misleading information to financial institutions, improper poaching of Plaintiffs' employees, and misappropriating Plaintiffs' confidential information and trade secrets resulting in Defendants': (i) violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO"); (ii) violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"); (iii) misappropriation of trade secrets; (iv) unfair competition; (v) tortious interference with contractual relations, business relations, and prospective economic advantage; (vi) unjust enrichment; (vii) conversion; (viii) fraud; (ix) breach of fiduciary duty; and (x) civil conspiracy.

5.      Defendants' diabolical scheme to infiltrate and leech off of Plaintiffs' businesses, causing Plaintiff's inconceivable harm, must be stopped.

6.      Specifically, Defendants must be prevented from operating businesses that were formed solely through Defendants' fraudulent schemes and utilizing Plaintiffs' confidential information and trade secrets stolen by the Defendants who have utilized Plaintiffs' employees to compete against Plaintiffs while said employees are being paid by Plaintiffs, all of which is being done to decimate Plaintiffs' businesses.

7.      In addition to being enjoined from their conduct which has threatened the imminent closure of Plaintiffs' businesses, Defendants must pay for damages for the harm they have caused to Plaintiffs' businesses.

## PARTIES

8.      At all times hereinafter mentioned, Northshore Motor Leasing, LLC ("Northshore") was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 180 Michael Drive, Syosset, New York 11791.

9.      At all times hereinafter mentioned, 189 Sunrise Hwy Auto, LLC ("Sunrise") was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 189 Sunrise Highway, Amityville, New York 11701.

10.      At all times hereinafter mentioned, plaintiff Brian Chabrier ("Chabrier") is an individual residing in the State of New York within the County of Nassau.

11.      At all times hereinafter mentioned, plaintiff Joshua Aaronson ("Aaronson") is an individual residing in the State of New York within the County of Nassau.

12.      At all times hereinafter mentioned, plaintiff Jory Baron ("J. Baron") is an individual residing in the State of New York within the County of Nassau.

13.      At all times hereinafter mentioned, plaintiff 1581 Hylan Blvd Auto LLC ("1581"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

14.      At all times hereinafter mentioned, plaintiff 1580 Hylan Blvd Auto LLC ("1580"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

4

15.     At all times hereinafter mentioned, plaintiff 1591 Hylan Blvd Auto LLC ("1591"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

16.     At all times hereinafter mentioned, plaintiff 1632 Hylan Blvd Auto LLC ("1632"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

17.     At all times hereinafter mentioned, plaintiff 1239 Hylan Blvd Auto LLC ("1239"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

18.     At all times hereinafter mentioned, plaintiff 2519 Hylan Blvd Auto LLC ("2519"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

19.     At all times hereinafter mentioned, plaintiff 76 Fisk Street Realty, LLC ("76"), was and still is a foreign limited liability company duly organized and existing under and by the virtue of the laws of the State of New Jersey, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

20.     At all times hereinafter mentioned, plaintiff 446 Route 23 Auto LLC ("446"), was and still is a foreign limited liability company duly organized and existing under and by the virtue of the laws of the State of New Jersey, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

21.     At all times hereinafter mentioned, plaintiff Island Auto Management, LLC ("IAM"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

22.     1581, 1580, 1591, 1632, 1239, 2519, 76, 446 and IAM are collectively referred to herein as "Island Auto Group" or "IAG."

23.     Robert Anthony Urrutia ("Urrutia") resides in the State of New Jersey; he is the President of Superb Motors Inc. ("Superb") and member of Team Auto Sales LLC ("Team Auto").

24.     At all times relevant, Superb is and was a corporation duly formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

25.     At all times relevant, Team Auto is and was a limited liability company duly organized under the laws of the State of New Jersey with its principal place of business in Monmouth County, New Jersey.

26.     Upon information and belief, Anthony Deo ("Deo") and Sarah Deo ("S. Deo") are individuals who reside in the State of New York within the County of Nassau and who are married to each other.

27.     Upon information and belief, Harry Thomasson ("Thomasson") is an attorney-at-law who resides in the State of New York within the County of Nassau.

28. Upon information and belief, Dwight Blankenship ("Blankenship") is a retired police officer who works for Deo and S. Deo who resides in the State of New York within the County of Nassau.

29. Upon information and belief, Marc Merckling ("Merckling") is an active police officer who works for Deo and S. Deo who resides in the State of New York within the County of Nassau.

30. Upon information and belief, Michael Laurie ("Laurie") is a principal of DLA Capital Partners Inc. who resides in the State of New York within the County of Nassau.

31. Upon information and belief, Thomas Jones, CPA ("Jones") is a principal of Jones, Little & Co., CPA's LLP ("Jones CPA LLP") who resides in the State of New York within the County of Nassau.

32. At all times relevant, Car Buyers NYC Inc. is and was a corporation duly formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

33. At all times relevant, Gold Coast Cars of Syosset LLC ("GCC Syosset") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

34. At all times relevant, Gold Coast Cars of Sunrise LLC ("GCC Sunrise") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

35. At all times relevant, Gold Coast Motors Automotive Group LLC ("GCM Auto") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

36.     At all times relevant, Gold Coast Cars of LIC LLC ("GCC LIC") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

37.     At all times relevant, Gold Coast Cars of Roslyn LLC ("GCC Roslyn") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

38.     At all times relevant, Gold Coast Cars of Smithtown LLC ("GCC Smithtown") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

39.     At all times relevant, UEA Premier Motors Corp. ("UEA Motors") is and was a corporation duly formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

40.     At all times relevant, DLA Capital Partners Inc. ("DLA Capital") is and was a corporation duly formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

41.     At all times relevant, Jones CPA LLP is and was a limited liability partnership formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

42.     At all times relevant, Libertas Funding LLC ("Libertas") is and was a foreign limited liability company duly organized under the laws of the State of Connecticut and authorized to conduct business in the State of New York with offices located at 411 West Putnam Avenue, Suite 220, Greenwich, Connecticut 06830.

43.     At all times relevant, Flushing Bank was and is a national association organized and existing under and by virtue of the laws of the United States of America.

## JURISDICTION AND VENUE

44.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 given that Plaintiff pursues claims under RICO and DTSA, both of which are federal laws.

45.     Further, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's state law claims against Defendants because they are part of the same case or controversy and arise under a common nucleus of operative facts.

46.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district and each of the Defendants reside in this district.

## FACTS

**i.      Deo is Not a Member of Northshore**

47.     At all times hereinafter mentioned, Chabrier was and still is an owner and holder of a one-third (1/3) membership interest in Northshore.

48.     Upon information and belief, at all times hereinafter mentioned, David Baron was an owner and holder of a one-third (1/3) membership interest in Northshore.

49.     Upon information and belief, David Baron died in 2021, and his estate ("Estate") is now the owner and holder of his one-third (1/3) membership interest in Northshore.

50.     Upon information and belief, at all times hereinafter mentioned, Asad Khan was and still is an owner and holder of a one-third (1/3) membership interest in Northshore.

51.     The operating agreement for Northshore (the "Northshore Operating Agreement")
provides that Northshore shall be managed by its members.

52.     Article V (A) of the Northshore Operating Agreement provides that decisions must
be approved by a majority in interest of the members.

53.     Article IX (A) of the Northshore Operating Agreement prohibits transfers or
assignments of membership interests without the unanimous consent of all members.

54.     Under Article IX (A) of the Northshore Operating Agreement, if the Members do
not unanimously approve of the transfer, "the transferee shall have no right to participate in the
management of the business and affairs of the Company or to become a Member."

**ii.     Deo is Not a Member of Sunrise**

55.     Upon information and belief, at all times hereinafter mentioned, Aaronson was and
still is an owner and holder of a twenty-five (25%) percent membership interest in Sunrise.

56.     At all times hereinafter mentioned, David Baron was an owner and holder of a
twenty (20%) percent membership interest in Sunrise.

57.     David Baron died in 2021 and his estate is now the owner and holder of his twenty
(20%) percent membership interest in Sunrise.

58.     At all times hereinafter mentioned, J. Baron was and still is an owner and holder of
a twenty (20%) percent membership interest in Sunrise.

59.     At all times hereinafter mentioned, Raymond Phelan was and still is an owner and
holder of a twenty (20%) percent membership interest in Sunrise.

60.     At all times hereinafter mentioned, Chabrier was and still is an owner and holder
of a twenty (20%) percent membership interest in Sunrise.

61.     The operating agreement for Sunrise (the "Sunrise Operating Agreement") provides that Sunrise shall be managed by its members.

62.     Article V (A) of the Sunrise Operating Agreement provides that decisions must be approved by a majority in interest of the members.

63.     Article IX (A) of the Sunrise Operating Agreement prohibits transfers or assignments of membership interests without the unanimous consent of all members.

64.     Under Article IX (A) of the Sunrise Operating Agreement, if the Members do not unanimously approve of the transfer, "the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member."

**iii.     Defendants' Unlawful Schemes at Island Auto Group**

65.     Northshore operates a retail used car dealership from its lot located at 180 Michael Drive, Syosset, New York 11791.

66.     Sunrise operates a retail used car dealership from its lot located at 189 Sunrise Highway, Amityville, New York 11701.

67.     The operation of a used car dealership in the State of New York requires a license (the "License") issued by the New York State Department of Motor Vehicles ("DMV").

68.     The application for the License requires an individual applicant who remains responsible as the licensee for the dealership's compliance.

69.     Chabrier holds the License as applicant for Northshore.

70.     Aaronson and J. Baron hold the License as applicant for Sunrise.

71.     At all times hereinafter mentioned, Deo was employed by Northshore as its general manager.

11

72.     At all times hereinafter mentioned, Deo was employed by Sunrise as its general manager.

73.     As an employee and general manager of both Northshore and Sunrise, Deo was and is obligated to act in the best interests of Northshore and Sunrise and their respective members.

74.     Deo, however, has taken numerous actions for his own benefit causing damage to Northshore and Sunrise and the Plaintiffs, and jeopardizing the Licenses.

   iv.    **Deo Sells Vehicles for Less Than Their Purchase Price, Causing a Deficiency Toward Repayment of the Floor Plan at IAG**

75.     Northshore and Sunrise maintain a floor plan credit line with Ally Bank used to purchase inventory (the "Floor Plan").

76.     Ally Bank maintains a lien on all vehicles purchased using the Floor Plan.

77.     When the vehicles are sold, Ally Bank must be repaid the amount borrowed to purchase that vehicle in order to release the lien or security interest on the vehicle.

78.     The Floor Plan is guaranteed by IAG.

79.     IAG is a group of franchised new car dealerships in New York and New Jersey in which David Baron had certain direct or family ownership.

80.     Chabrier is affiliated with IAG.

81.     Aaronson is affiliated with IAG.

82.     J. Baron is affiliated with IAG.

83.     IAG agreed to guarantee the Floor Plan because of the interrelationship between Northshore, Sunrise, David Baron, Chabrier, Aaronson, and J. Baron.

84.     Deo, on behalf of Northshore and Sunrise, purchased many vehicles using the Floor Plan.

85.     Deo then sold those vehicles for less than their purchase price, causing Northshore and Sunrise to sustain significant damages.

86.     Selling vehicles for less than their purchase price created a deficiency toward repayment of the loan made by Ally Bank to purchase each such vehicle.

87.     As guarantor, IAG had to pay Ally Bank over $3,000,000.00 to satisfy Northshore and Sunrise's Floor Plan deficiency.

88.     A recent inspection by Plaintiffs as well as a recent audit by Ally Bank of the floor planned vehicles revealed that several vehicles could not be located.

89.     That audit also revealed that several vehicles were damaged.

**v.      Deo Fails to Cause Northshore and Sunrise to Pay Off Existing Loans on Vehicle Trade-Ins**

90.     Northshore and Sunrise accepted customer trade-ins of vehicles to be used toward their purchase ("Trade-ins").

91.     Trade-ins with existing loan or lease balances were required to be satisfied by Northshore.

92.     Deo failed to have Northshore and Sunrise pay off the existing loan or lease balances on numerous Trade-ins.

93.     The prior owners of these vehicles remained liable to make payments on the debt despite no longer having ownership or control of the vehicle.

94.     Deo's failure to cause Northshore and Sunrise to pay off the loans on the Trade-ins has potential criminal liability, civil liability and loss of the DMV Licenses.

95.     Deo's failure to have Northshore and Sunrise pay off the loans may also affect the ability of the licensees, Chabrier, Aaronson and J. Baron, to obtain a DMV License for any other dealership facility.

96.   In order to avert the consequences of Deo's failure to pay off the loans on Trade-ins, IAG satisfied $191,400.54 of the outstanding obligations and will be paying another $130,226.38.

**vi.    Deo Failed to Perfect Liens on Behalf of Various Lenders, Resulting in Additional Potential Liability to IAG**

97.   Northshore and Sunrise arranged financing for their customers through contracted lenders.

98.   Northshore and Sunrise have written agreements with these lenders that require Northshore and Sunrise to ensure that title to any vehicle they finance has a lien placed thereon to protect the lender in the event of a default by the consumer.

99.   These agreements also require Northshore and Sunrise to repurchase any loan made by the lender to a consumer if Northshore and Sunrise do not follow their contractual requirements when arranging the loan, such as the failure to place a lien on the title.

100.   Deo failed to have Northshore and Sunrise perfect liens on behalf of the various lenders upon the sale and financing of numerous vehicles sold by Northshore and Sunrise.

101.   As a result of Deo's actions, in clear violation of lender agreements, those lenders demanded repurchase of those loans.

102.   In order to protect the investment of David Baron, Chabrier, Aaronson and J. Baron in Northshore and Sunrise and their goodwill with these lenders, with whom they have other agreements through IAG, IAG has or will have to pay over $850,000.00 if Deo does not do so.

**vii.    Deo Failed to Pay Warranty Companies and Vendors, and Failed to Account for Dealer and Other License Plates**

103.   Northshore and Sunrise sell, on behalf of third party warranty providers, extended warranties to consumers.

104.    Under Deo's direction, Northshore and Sunrise have issued warranties to consumers and collected the fees but have failed to pay over $100,000.00 due to the warranty companies, which will result in the voiding of the warranties for which consumers have paid.

105.    Deo has caused Northshore and Sunrise to fail to pay more than $58,000.00 owed to vendors.

106.    In addition, Deo has not completed the documentation necessary to complete registrations for out of state customers and cannot account for numerous missing titles on vehicles.

107.    The DMV License authorizes Northshore and Sunrise to have "dealer" license plates and to issue New York State license plates on purchased vehicles.

108.    These license plates are carefully accounted for and the License holder is responsible for their protection and proper issuance.

109.    Despite due demand, Deo has refused to account for the dealer license plates and a number of unissued New York State license plates that would ultimately be used for customers.

110.    Upon information and belief, Deo's family and friends continue to use the dealer plates.

**viii.    Deo Wastes Company Assets and Further Obligates Plaintiffs**

111.    Deo delivered certain unsold vehicles owned by Northshore and liened by Ally to repair facilities to be repaired.

112.    Despite due demand, however, Deo has failed to disclose the identity or location of the various repair facilities housing these vehicles.

113.    Upon information and belief, one or more of the repair facilities has placed a garagemen's lien on one or more of these vehicles for repair and/or storage charges.

114.    Deo has failed to arrange for payment to these facilities or alert Plaintiffs of the garagemen's lien, resulting in the sale of these vehicles at auction to satisfy the garagemen's lien.

115.    Northshore and Plaintiffs remain liable to Ally to satisfy the loans on these vehicles.

**ix.    Deo Takes and Uses Dealership Assets for His Own Purposes**

116.    Deo has been treating Northshore, Sunrise, and their respective assets as his own.

117.    Deo has personally taken over $230,000.00 in customers' cash deposits, rather than deposit the money in Northshore's account.

118.    Despite Deo having no signatory authority on Northshore's bank accounts, he has been issuing and signing checks from its accounts to pay for his personal expenses, among other things.

119.    For example, Deo issued a $60,000.00 check from Northshore to Car Buyers NYC, Inc., a corporation formed and owned by Deo.

120.    Deo also uses an American Express card issued in the name of Sunrise, which he obtained without authority or approval, to pay for personal expenses.

121.    In addition, Deo failed to terminate $303,043.12 of lender financing for consumers who canceled their purchases.

122.    Upon information and belief, Deo personally took those loan proceeds.

123.    Finally, Deo's son continues to drive, for his personal use, a luxury Maserati, valued at almost $80,000 and paid for by IAG, without IAG's consent.

**x.    Deo Falsely Claims Full Ownership of Northshore and Sunrise to Obtain EIDL Loans, The Proceeds of Which Deo Personally Converted**

124.    Almost immediately after the death of David Baron, Deo, purportedly on behalf of Northshore, applied through the Small Business Association ("SBA") for a COVID-19 Economic Injury Disaster Loan ("EIDL") in the amount of $196,425.00.

16

125. In connection with the EIDL application, Deo falsely claimed to be a fifty (50%) percent owner of Northshore.

126. Deo submitted the false application without the knowledge or approval of Northshore's members.

127. Similarly, Deo submitted to the SBA an EIDL application purportedly on behalf of Sunrise, falsely claiming he has been the sole owner of Sunrise since January 1, 2021.

128. Deo submitted this false application without the knowledge or approval of Sunrise's members.

129. Upon information belief, Deo personally took the proceeds from each of the EIDL loans.

### xi. Deo Falsely Claims Full Ownership of Northshore and Sunrise to Obtain The Libertas Funds and Converts the Libertas Funds

130. On or about November 15, 2022, Deo, purportedly on behalf of Northshore, entered into an agreement with Libertas ("Libertas Agreement") pursuant to which Northshore agreed to sell $997,500.00 of its future receipts (the "Future Receipts") to Libertas for the purchase price of $735,000 (the "Libertas Funds").

131. Deo, purportedly on behalf of Northshore, entered the Libertas Agreement without the knowledge or consent of Northshore's members.

132. In connection with the Libertas Agreement, Deo falsely misrepresented to Libertas that he was the sole owner of Northshore.

133. Deo's purported sale of the Future Receipts was to the first step in his scheme to wrongfully convert for himself the Libertas Funds.

134.    Deo, aware of his inability to withdraw the Libertas Funds from Northshore's bank account, arranged for the Libertas Funds to be deposited into Sunrise's bank account, from which he was able to withdraw funds.

135.    When Plaintiffs confronted Deo concerning his actions, Deo falsely claimed that he was the sole owner of Northshore and Sunrise.

xii.    **Despite His Obligation to Safeguard the Libertas Funds, Thomasson Aids and Abets Deo's Conversion by Disbursing the Libertas Funds to Deo**

136.    Upon learning of Deo's misconduct, Plaintiffs took reasonable steps to ensure Deo would not abscond with the Libertas Funds.

137.    At all relevant times, Thomasson claimed to be the attorney for Northshore, Sunrise and Deo.

138.    Upon information and belief, Thomasson was aware the Libertas Funds were paid by Libertas to Northshore for the purported sale of the Future Receipts.

139.    Thomasson was aware there was a dispute between Plaintiffs, Deo and Libertas concerning Deo's right to have acted on Northshore's behalf with respect to the sale of the Future Receipts.

140.    Thomasson was aware that there was a dispute concerning the rights to the Libertas Funds.

141.    Plaintiffs arranged to place the Libertas Funds into Thomasson's attorney trust account for safekeeping pending resolution of the parties' dispute, rather than turn over the Libertas Funds to Deo, who was not the rightful owner of the Libertas Funds.

142.    Plaintiffs did so because Detective Marx at Second Precinct of the Nassau County Police Department threatened to have Aaronson arrested if he did not turn over the funds.

143. Upon information and belief, Blankenship and Merckling, at the behest of Deo, abused their authority as retired and active police officers to engage Detective Marx to make this threat.

144. As a result of these threats, and to ensure the Libertas Funds would remain secure, Plaintiffs requested that Thomasson maintain the Libertas Funds in his attorney trust account pending resolution of the parties' dispute concerning the Libertas Funds.

145. Despite Thomasson's knowledge of the dispute concerning the parties' rights to the Libertas Funds, Thomasson did as he pleased and immediately disbursed the Libertas Funds to Deo.

146. Indeed, Thomasson has declared in open Court, in sum and substance, that no one was going to tell him what to do with his escrow account.

147. And so, despite Thomasson's knowledge that the Libertas Funds were the consideration paid by Libertas to Northshore for the purported sale of the Future Receipts, Thomasson disbursed the Libertas Funds to Deo.

148. Libertas has interposed counterclaims in a state court action seeking to recover the value of the Future Receipts and/or the return of the Libertas Funds. See Chabrier, et al. v. Deo, et al., Index No.: 617224/2022 (Nassau County Supreme Court), NYSCEF Docket Entry 57.

**xiii. Deo Further Encumbers and Diverts Northshore's Assets**

149. Upon information and belief, Deo, falsely claiming to be the sole owner of Northshore, arranged to borrow funds from Flushing Bank and/or Flushing Financial Solutions (collectively "Flushing").

150. Deo's representations to Flushing concerning the ownership of Northshore and Sunrise were false and supported by false financial records which were altered by Jones and Jones CPA LLP.

151. Upon information and belief, Deo employed the assets of Northshore to secure the loan from Flushing and did so for the purpose of personally taking those Flushing loan proceeds.

152. Deo arranged this loan without the knowledge or approval of Northshore's members.

**xiv. Defendants' Unlawful Schemes at Superb Motors Inc.**

153. At all times relevant, since its inception in June 2021, Urrutia was the President and majority shareholder of Superb Motors Inc. ("Superb").

154. In addition to Superb, Urrutia owns Volkswagen of Freehold, Team-Mitsubishi Hartford, and Team Nissan of Pittsfield Massachusetts.

i. <u>Deo meets with Urrutia and gains his confidence</u>

155. Urrutia first met Deo in November 2022 through a mutual friend in the automobile industry at which time Deo held himself out to be qualified to run an automobile dealership and sought to enter into a partnership with Urrutia at Superb.

156. Urrutia and Deo entered into a Cross-Purchase Agreement (the "Cross Purchase Agreement") dated as of December 1, 2022 in which Deo would pay Urrutia $500,000.00 and issue him a twenty-five percent (25%) interest in Northshore Motor Leasing LLC ("Northshore") and 189 Sunrise Hwy Auto LLC ("Sunrise") in exchange for Deo obtaining a forty-nine percent (49%) interest in Superb.

157. Prior to entering into the Cross-Purchase Agreement, Deo made representations and warranties to Urrutia[1] that, among other things, he:

(i) is the sole owner of Northshore and Sunrise, respectively;

---

[1] Plaintiffs Superb Motors Inc. and Urrutia do not pursue claims for breach of those representations and warranties in this case but provide this information as relevant to the facts and circumstances warranting relief here. Plaintiffs Superb Motors Inc. and Urrutia shall pursue their claims for breach of contract under the Cross-Purchase Agreement and related causes of action in the Supreme Court of the State of New York, Nassau County.

(ii) has full power and legal right to transfer and deliver units of Northshore and Sunrise, respectively;

(iii) has not made any representation or warranty that constitutes an untrue statement of a material fact or omits to state a material fact necessary to make it not misleading; and

(iv) has no pending or threatened suit, action, bankruptcy, or administrative proceeding, or other arbitration or proceeding, which could adversely affect the ability of Deo to perform any of his obligations, including Deo's obligation to convey the units of Northshore and Sunrise free and clear of all liens and encumbrances.

158.    Deo issued a check to Urrutia on November 14, 2022 in the amount of $100,000.00 as a deposit on the foregoing agreement.

159.    However, this check bounced the following day due to being returned for insufficient funds.

160.    Due to Thomasson's direct participation in the perpetuation of Deo's fraudulent scheme, Thomasson enabled Deo to pay Urrutia funds fraudulently obtained from Libertas, unbeknownst to Urrutia.

161.    Indeed, on November 21, 2022, $735,000.00 was wired into Thomasson's escrow account due to Blankenship's and Merckling's intervention with the Nassau County Police Department in making Aaronson believe he would be arrested if he did not turn over the $735,000.00 fraudulently obtained from Libertas.

162.    Deo then wired Urrutia $500,000.00 in two (2) separate wires of $300,000.00 on November 22, 2022 and $200,000.00 on November 29, 2022, both of which were issued from Car Buyers despite the fact those funds obviously came from Thomasson's escrow account.

163.    Having paid for his shares of Superb with these stolen funds, on December 1, 2022, Deo executed the Cross-Purchase Agreement.

ii.    <u>Deo has limited powers as a minority shareholder of Superb</u>

164.    A few weeks later, Urrutia and Deo then executed a Shareholders' Agreement for Superb.

165.    The Shareholders' Agreement provides that effective December 22, 2022, Urrutia holds a fifty-one percent (51%) interest in Superb while Deo owns a forty-nine percent (49%) interest in Superb.

166.    The Shareholders' Agreement provides that Urrutia is the President, and that he, alone, and independent of any other shareholders, directors, and officers may exercise (i) the right to make all decisions concerning day-to-day operations of the Corporation, or to delegate such authority as the President desires; and (ii) the right to hire and/or terminate all employees of the Corporation, except as otherwise provided, it being expressly agreed, that this power does not include the right to terminate a Shareholder.

167.    It similarly provides that all actions requiring shareholder consent require the written consent of least a majority of the voting shares; crucially, this includes the granting of any mortgage, lien, or other security interest in the assets of Superb or any loans and guarantees by Superb.

168.    The Shareholders' Agreement restricts the right to sell the stock of Superb only by a majority of the voting stock of Superb, *i.e.*, by the written consent of Urrutia, its majority shareholder.

169.    The Shareholders' Agreement provides that Urrutia has the following responsibilities, among others:

(i) final say on hiring and firing of employees and all other personnel decisions, including but not limited to third party vendors, agents and/or contractors;

(ii) capitalization of the Corporation;

(iii) establishment of policies and standards for services provided by Superb, as well as supervision and complete authority over Superb's activities; :

(iv) review and final approval of financing arrangements with lending institutions to be utilized by Superb in financing the purchase of used vehicles by customers and approval of creditworthiness of potential purchasers of automobiles; and

(v) *supervise and have complete control of the accounting department of Superb, which shall include but not be limited to sole check authorization and sole control of bank accounts owned by Superb*.

170.    In contrast, Deo's only responsibilities under the Shareholders' Agreement were to propose an individual who will serve as the General Manager of the day-to-day operations of Superb, whom Urrutia had final authority to approve or reject.

171.    Notwithstanding the clear and unambiguous language in the foregoing agreements, Plaintiffs soon learned that Deo made a series of material false representations.

172.    First, despite his representation that he is the sole member of Northshore and Sunrise, it was discovered that, in fact, Deo is not the sole member of either; in fact, within five days of entering into the Cross-Purchase Agreement, Deo was sued by the actual owners of Northshore and Sunrise!

173.    In that lawsuit, the *real* owners of Northshore and Sunrise allege that Deo has engaged in financial improprieties and massive fraud that is strikingly similar to the conduct complained of with respect to Superb.

174. Second, because Deo never held any membership interest in Northshore nor any ownership interest in Sunrise, Deo misrepresented that he had full power and legal right to transfer and deliver shares of Northshore and Sunrise to Plaintiff.

175. Third, Deo made a material misrepresentation when he informed Urrutia that there was no active or anticipated litigation against him since Northshore and Sunrise commenced an action against him in state court!

iii. Defendants' first scheme against Superb: impermissible double-flooring

176. Dealerships typically operate with the assistance of banks who provide "floor plan" financing, which is collateralized by the vehicles available for sale at the dealership.

177. When a dealership obtains such financing, the bank that provides same perfects a security interest in the vehicle and certain rules attach as a condition of the financing, *i.e.*, with limited exceptions, any such vehicle financed must be present and available for sale at the dealership.

178. On July 31, 2023, Nissan Motor Acceptance Corporation ("NMAC") contacted Bruce Novicky ("Novicky"), the Chief Operating Officer ("COO") of Superb, to inform him that NMAC discovered vehicles financed by it were financed with another bank in breach of Superb's floor plan agreement with NMAC.

179. This practice is called "double flooring" in dealership lexicon and is prohibited.

180. Because of this prohibited conduct, Urrutia was required to pay NMAC $760,868.75 to cure the default under Superb's agreement with NMAC.

181. Novicky confronted Deo about this issue and Deo provided inadequate explanations for what had transpired.

182. Defendants S. Deo, Harry Thomasson, Dwight Blankenship, Marc Merckling, Michael Laurie, and Thomas Jones, CPA each substantially assisted Deo in carrying out this scheme by acting as his agents at his direction in, among other things, filling out applications for financing and making material misrepresentations in said applications, discussing together the plan to defraud Plaintiffs and the floor plan financing companies, and profiting from the scheme together.

183. Superb and Urrutia were thus damaged by the Defendants' conduct.

iv.   Defendants' second scheme against Superb: misappropriation & theft of vehicles

184. When Novicky informed Urrutia about the double-flooring, it caused great concern such that, on August 3, 2023, consistent with his authority over the day-to-day operations at Superb under the Shareholders' Agreement, he delegated to Novicky the task of conducting a physical inventory at Superb in order to ensure that: (i) all "floor planned" vehicles were on premises at Superb as required; and (ii) that all vehicles entered into the dealership management system ("DMS") were also on premises.

185. The inventory resulted in the astonishing amount of over one hundred (100) vehicles missing despite the fact that they were listed as assets in Superb's DMS system and on its general ledger.

186. Novicky confronted Deo about the missing vehicles; in response, Deo demonstrably lied as to certain vehicles and failed to adequately explain why other vehicles were missing from Superb.

187. As an example of Deo's clear lies, Deo explained that one particular vehicle was sold; however, when Novicky contacted the customer listed for that purchase, the customer denied purchasing that particular vehicle.

188.   Moreover, Deo was unable or unwilling to supply documentation to substantiate the supposed sale.

189.   Due to the foregoing, Urrutia exercised his right to remove Deo from the day-to-day operations of Superb and instituted a top-down audit of all operations.

190.   The findings included incontrovertible proof of Deo's duplicity and clear breaches of his fiduciary obligations.

v.   Defendants' third scheme against Superb: use of forged instruments

191.   Urrutia discovered that Deo misrepresented to Flushing Bank that he is the sole owner of Superb in order to open and maintain a bank account for Superb with Flushing Bank.

192.   Deo's representation to Flushing Bank was blatantly false.

193.   Deo's actions violated the Shareholders' Agreement because, by its plain terms, only Urrutia had check authorization and only Urrutia was to have control over bank accounts owned by Superb.

194.   Deo opened this account to divert Superb's funds to an account that he can control.

195.   Upon information and belief, Deo paid Defendants S. Deo, Harry Thomasson, Dwight Blankenship, Marc Merckling, Michael Laurie, and Thomas Jones, CPA from this account for their substantial assistance in carrying out his fraudulent schemes.

vi.   Defendants' fourth scheme against Superb: misappropriation of funds

196.   Urrutia learned that Deo misappropriated customer payments for certain vehicles sold by depositing those funds into the unauthorized Flushing Bank account and then transmitting those funds into his own personal accounts and those of Defendants S. Deo, Harry Thomasson, Dwight Blankenship, Marc Merckling, Michael Laurie, and Thomas Jones, CPA for their substantial assistance to Deo in carrying out his unlawful schemes.

197.    To Urrutia's knowledge, Deo misappropriated approximately $455,000.00 under this scheme.

vii.    <u>Defendants' fifth scheme against Superb: theft of cash payments by customers</u>

198.    Deo misappropriated cash payments from customers by receipting the cash in to Superb's DMS system but never depositing any of those cash payments into Superb's bank account and instead pocketing the money for himself.

199.    Upon information and belief, Defendant Marc Merckling substantially assisted Deo in this scheme by physically taking the cash out of the safe at Superb and failing to deposit the cash into Superb's bank account as required.

200.    Upon information and belief, Defendant Marc Meckling was paid out of these cash funds because he is an officer with the Nassau County Police Department and is not permitted to have any outside employment without advance approval from the Nassau County Police Department.

201.    To Urrutia's knowledge, Deo misappropriated in excess of $400,000.00 under this scheme.

xiii.    <u>Defendants' sixth scheme against Superb: signing unauthorized checks</u>

202.    Deo knew that only Urrutia had sole check authorization because he executed the Shareholders' Agreement stating so.

203.    Notwithstanding this, Deo signed multiple checks from Superb's bank accounts that were under the control of Urrutia.

204.    Deo had no authority to sign any checks from any bank account maintained by Superb.

205.     During its top-down audit, Urrutia discovered that Deo routinely wrote and signed checks issued by Superb and made payable to Northshore.

206.     Deo's conduct constitutes wire fraud.

ix.     <u>Defendants' seventh scheme against Superb: purchase vehicles under its name</u>

207.     After Deo was removed from Superb, Defendants purchased five (5) vehicles from Manheim, an automobile auctioneer, under Superb's account and misappropriated these vehicles.

208.     Upon information and belief, Defendants intend to sell these vehicles for 100% profit with no cost to Defendants and leave Superb holding the proverbial bag.

x.     <u>Defendants' eighth scheme against Superb: build their own group of dealerships</u>

209.     In trying to understand Deo's motive for engaging in these schemes, the top-down audit conducted by Urrutia soon made Deo's intentions very clear.

210.     For months, while he was repeatedly lying to and stealing from Plaintiffs, Deo has been forming various corporate entities – GCC Syosset, GCC Sunrise, GCC LIC, GCC Roslyn, and GCC Smithtown – in order to begin his own group of dealerships to be operated under the master entity Gold Coast Motors Automotive Group.

211.     Prior to Deo's working relationship with Urrutia, Deo had no familiarity with Urrutia's dealership processes and know-how, which Urrutia imparted to him as a business partner for the mutual success of Superb.

212.     For example, Urrutia introduced Deo to Tekion, a unique DMS system that was specifically customized for Superb, and taught Deo the process of successfully operating an automobile dealership using Tekion, such as processes to streamline dealership operations, inventory management, cash flow management, and reporting features that identify areas of improvement.

213.    The information Urrutia imparted to Deo was unique, confidential, and proprietary.

214.    Specifically, the DMS system Urrutia implemented at Superb is unique because it was custom-designed for Superb, and cost over $120,000.00 to set up; it contained the blueprint for Urrutia's success at his dealerships because Urrutia knew how to use the customized features of Tekion to profitably operate dealerships.

215.    During the top-down audit, Novicky discovered that Deo sought to misappropriate this customized, unique, and proprietary blueprint for the purpose of setting it up at his own group of dealerships.

216.    In other words, Deo stole the exact customization used by Superb to use at his competing group of dealerships.

217.    In addition, in a blatant breach of his fiduciary duties to Superb and Urrutia, Deo had Superb employees work for his own group of dealerships *while they were employed by Superb and were being paid to perform work only for Superb!*

218.    Moreover, Deo illegally imparted the confidential know-how Urrutia imported to him, as well as the proprietary information Superb had in its possession, i.e., Superb's customer lists with contact information of its customers, customized Tekion DMS system, and other sensitive information to these employees for the purpose of setting up Deo's own group of dealerships.

219.    Indeed, Deo and the employees he poached misappropriated Superb's customer list and used it to divert Superb's customers to other dealerships, including those in which Deo had an interest.

220. Defendants S. Deo, Harry Thomasson, Dwight Blankenship, Marc Merckling, Michael Laurie, and Thomas Jones, CPA each substantially assisted Deo in carrying out his unlawful schemes.

221. S. Deo managed and controlled the improperly-opened bank account in which Superb's funds were diverted.

222. Dwight Blankenship and Marc Merckling each misappropriated cash payments paid to Superb by customers of Superb and abused their authority as former or active police officers in carrying out their actions at the behest of Deo.

223. For example, when Urrutia called the Nassau County Police Department to remove Deo, Dwight Blankenship and Marc Merckling used their positions as retired and active police officers to stymie an investigation and protect Deo from being arrested for his blatantly criminal conduct.

224. Laurie enabled Defendants by substantially assisting them in opening a bank account at Flushing Bank, with whom Laurie has a relationship through his business DLA Capital Partners Inc.

225. Laurie knew that Deo was not the 100% shareholder of Superb because he had sat in on meetings with Urrutia and Deo and knew that Urrutia was the majority shareholder of Superb with sole check authorization and sole control of all Superb bank accounts.

226. Similarly, although Jones knew that Urrutia was the majority shareholder of Superb with sole check authorization and sole control of all bank accounts, he nonetheless filed tax returns on behalf of Superb stating that its sole shareholder was Deo when that was blatantly false.

227. The tax returns filed by Jones and his firm were utilized to obtain a bank account for Deo to divert funds as well as to obtain loans, which Deo was not permitted to do pursuant to the Shareholders' Agreement.

228. Jones and his firm were thus complicit in the fraudulent schemes perpetrated by Deo, and Jones and his firm aided and abetted Deo and the remaining Defendants in carrying out the fraudulent schemes.

229. Finally, Thomasson serves as counsel to the Defendants and substantially assists them in carrying out their unlawful schemes by defending their blatantly criminal conduct despite knowing that Defendants have engaged in fraud.

230. Thomasson has engaged in the aforesaid fraud together with the remaining Defendants.

231. For example, although Thomasson purports to maintain an office at 380 Sunrise Highway, Wantagh, NY, this address is a UPS Store and not an office.

232. Instead, Thomasson maintained an office at Superb where he directly conspired with and carried out the directives of Deo in furthering his unlawful schemes for the benefit of Deo, Thomasson, and the remaining Defendants.

233. Urrutia also learned and is continuing to learn of other schemes to plunder and destroy Superb.

234. For example, on February 22, 2023, Deo applied for a license with the Department of Motor Vehicles ("DMV") for GCC Sunrise and *lied* to the DMV stating that he had never been convicted of a crime when, in fact, he had.

235. Specifically, Deo was previously convicted in 2016 for wire fraud in relation to a mortgage.

31

236.     Defendants engaged in wide-ranging schemes to defraud the Plaintiffs through wire fraud and the use of forged instruments.

237.     Defendants S. Deo, Harry Thomasson, Dwight Blankenship, and Marc Meckling aided and abetted Deo in delivering unauthorized checks to banks and presenting them for payment.

238.     Defendants Michael Laurie and Thomas Jones, CPA enabled wire fraud and the use of forged instruments to occur by creating or submitting the forged instruments, i.e., false tax returns, false bank applications, and false loan applications, to assist in the remaining Defendants' scheme to steal from Superb.

239.     Defendants' conduct constitutes a violation of the DTSA, and related state law common claims for misappropriation of trade secrets and unfair competition, as well as, among other things, a breach of Deo's fiduciary duty to Urrutia.

240.     Defendants S. Deo, Harry Thomasson, Dwight Blankenship, Marc Meckling, Michael Laurie, and Thomas Jones, CPA assisted Deo in setting up his competing group of dealerships built with the stolen trade secrets and confidential information of Superb, which these Defendants did in exchange for payments by Deo out of the funds stolen from Superb.

241.     Defendants are currently benefitting from the confidential information Plaintiff developed and sourced over thirty years in the automobile dealership industry, and since 2020, when he came to own his first dealership – which Defendants stole from Plaintiff.

242.     This information includes Superb's customer lists, Urrutia's contacts, including Tekion and Superb's customized DMS system from Tekion, and other proprietary information.

243. Superb's business model, its customer lists, information related to its revenues and profit margins, and the related information Deo obtained during his employment with Superb are confidential and proprietary, and took great costs and efforts to create, including Urrutia's decades of experience in the automobile industry, the relationships Urrutia developed with contacts in the automobile industry, and the unique know-how he has in how to successfully operate automobile dealerships.

244. Urrutia went through painstaking efforts, time, and money to build the group of dealerships he owns to what it is today.

245. Superb and Urrutia have spent the last three years marketing Superb, developing its brand, and cultivating relationships with Superb's customers and contacts in the automobile industry, many of whom worked with Urrutia for decades.

246. Deo only learned of Superb's know-how and trade secrets through his fiduciary relationship with Urrutia, for the sole purpose of maximizing Superb's success, and Defendants have sought to exploit this information through improper means by working with Deo to pillage and plunder Superb because Deo has paid and is paying the remaining Defendants out of the funds he has stolen from Superb for their assistance in carrying out his fraudulent schemes.

247. Superb's trade secrets, including but not limited to its customer lists, employees, processes, and unique DMS system are vital to its business; possession of that information, which Defendants misappropriated in contravention of their fiduciary duty to Plaintiff and in violation of the law, provided Plaintiff a unique competitive advantage in the automobile dealership industry, a competitive advantage it has been stripped of by Defendants' unlawful acts.

248.    Superb took many reasonable measures to keep its confidential information secret, including restricting access of this information only to employees who have a fiduciary duty to Superb, all of whom are required to maintain it in a secured computer system protected by firewalls and other appropriate safeguards, such as usernames and passwords.

249.    The confidential information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means from others who could otherwise obtain economic value from the disclosure or use of the information.

250.    This confidential information is related to services used in and intended for use in interstate or foreign commerce because Superb sells vehicles in New Jersey, Connecticut, Pennsylvania, and Massachusetts, among others, in the regular course of its business.

251.    Deo, S. Deo, Thomasson, Blankenship, and Merckling knew and had reason to know that the trade secrets and confidential information they obtained – including customer lists, financial information, details about customers, and Superb's proprietary DMS system – were acquired by improper means.

252.    This is evidenced by their bad faith conduct in plundering, pillaging, and massacring the good will and value of Superb.

253.    The unauthorized acts of these Defendants in using critical confidential information to cut Superb out of its business in order to build a competing group of dealerships is unlawful.

254.    There was no other way to obtain this information and Deo, S. Deo, Thomasson, Blankenship, and Merckling used it as a "roadmap" and "step by step manual" to establish their own operations to the exclusion of Superb and Urrutia to whom they owed fiduciary duties.

255. For example, Deo, S. Deo, Thomasson, Blankenship, and Merckling did not need to expend time, effort, and money in building a customized DMS system: they simply stole it from Superb and Urrutia.

256. Similarly, Deo, S. Deo, Thomasson, Blankenship, and Merckling did not need to search for customers: they simply diverted them from Superb to their own group of dealerships.

257. Moreover, Deo, S. Deo, Thomasson, Blankenship, and Merckling did not need to hire and pay employees: they simply had Superb's employees work for the benefit of their own group of dealerships while being paid by Superb.

258. Superb's trade secrets and confidential information that Deo, S. Deo, Thomasson, Blankenship, and Merckling misappropriated through gaining the trust of Urrutia by and through A'. Deo's fiduciary relationship as a minority shareholder of Superb provided them with the ability to duplicate operational, service, and development techniques that Urrutia has spent years, if not decades, establishing; meanwhile, Deo, S. Deo, Thomasson, Blankenship, and Merckling gained access to information through subterfuge that they would have no other way of obtaining.

259. Deo, S. Deo, Thomasson, Blankenship, and Merckling misappropriated such confidential and trade secret information by engaging in outright misappropriation; no permission was given to them to utilize Superb's customer lists, customer information, proprietary DMS system, financial information, and details about Superb's customers for any purpose except for the benefit of Superb.

260. It is obvious from Deo, S. Deo, Thomasson, Blankenship, and Merckling's brazen tactics that they are actively engaged in a scheme to plunder and destroy Superb - a company Urrutia spent years building.

261.    Upon information and belief, a significant number of Superb's customers have been solicited by Deo, S. Deo, Thomasson, Blankenship, and Merckling using Superb's trade secrets and confidential information.

262.    Immediate injunctive relief and a permanent injunction is necessary to prevent Deo, S. Deo, Thomasson, Blankenship, and Merckling from destroying the customer relationships, brand, and goodwill that Urrutia and Superb have spent years building, from profiting on a business which they stole from Superb, and causing further imminent and irreparable financial harm to Superb.

263.    In addition to shutting down Deo's other businesses, specifically, Defendants Car Buyers NYC Inc., Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC, and UEA Premier Motors Corp., Deo, S. Deo, Thomasson, Blankenship, and Merckling should be directed to return the misappropriated information and enjoined from engaging in any further unlawful conduct, it is essential that Superb also be permitted to forensically examine Deo, S. Deo, Thomasson, Blankenship, and Merckling's email accounts, computers, cellular phones, and any other electronic devices or cloud storage accounts, to determine the exact nature and extent of their unlawful scheme to steal Superb's business.

### AS AND FOR THEIR FIRST CAUSE OF ACTION
(Violation of RICO, 18 U.S.C. § 1962 – All Defendants)

264.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

265.     Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) in that each is either an individual, corporation, or limited liability company, or other person capable of holding a legal interest in property.

266.     At all relevant times, each of Defendants was, and is, a person that exists separate and distinct from the Enterprise, described below.

267.     Deo controls the Gold Coast entities and is the mastermind of the Enterprise, which consists of Deo, S. Deo, Thomasson, Blankenship, Merckling, Laurie, Jones, and each of their respective corporate entities.

268.     Deo was previously convicted in 2016 for wire fraud in relation to a mortgage.

269.     Defendants S. Deo, Harry Thomasson, Dwight Blankenship, Marc Meckling, Michael Laurie, Thomas Jones, CPA are individuals and instrumental in the furtherance of the Enterprise, each of whom engaged in wire fraud or substantially assisted in carrying out the wire fraud through the use of forged instruments as outlined *supra*.

270.     The corporate entity Defendants were utilized by the individual Defendants to assist, enable, and perpetuate their fraudulent schemes.

271.     Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

272.     Defendants constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

273.     Defendants are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise engaged in the conduct of their affairs through a continuing pattern of racketeering activity.

274.    The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of the racketeering activity.

275.    There may also be other members of the enterprise who are unknown at this time.

276.    Since at least 2018 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of purportedly working for dealerships.

277.    These activities constitute racketeering activity within the meaning of 18 U.S.C. § 1962(c), (d), 18 U.S.C. § 1961(6) because they violate 18 U.S.C. §§ 1341 and 1343.

278.    Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1).

279.    The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise.

280.    Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

281.    Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below.

282.    Defendants each committed at least two such acts or else aided and abetted such acts.

283.   The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims, and method of commission, as is evidenced by the fact two (2) separate groups of dealerships have been impacted by Defendants' unlawful conduct.

284.   Further, the acts of racketeering by Defendants have been continuous.

285.   There was repeated conduct during a period of time beginning in approximately 2018 and continuing to the present, and there is a continued threat of repetition of such conduct.

286.   The Enterprise, as alleged herein, was not limited to the predicate acts and extended beyond the racketeering activity. Rather, it existed separate and apart from the pattern of racketeering activity for the legitimate business purpose of running automobile dealerships.

287.   Plaintiffs specifically allege that Defendants participated in the operation and management of the Enterprise by overseeing and coordinating the commission of multiple acts of racketeering as described below.

288.   Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud) in that they devised or intended to devise a scheme or artifice to defraud Plaintiffs or to obtain money from Plaintiffs and others by means of false or fraudulent pretenses, representations, or promises.

289.   For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the US. mails or by private or commercial interstate carriers, or received such therefrom.

290.   Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs and signals.

291.     The acts of Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

292.     These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

293.     Defendants could not have carried out their scheme had they not used the U.S. mails or private or commercial interstate carriers or interstate wires. In furtherance of their scheme alleged herein, Defendants communicated among themselves and with Plaintiffs and others in furtherance of the scheme to defraud Plaintiffs.

294.     These communications were typically transmitted by wire (i.e., electronically) and/or through the United States mails or private or commercial carriers.

295.     Specifically, each Defendant did transmit the executed form of their operative contracts through electronic mail or other means of electronic communications.

296.     Additionally, upon information and belief, each Defendant did use electronic means of communications in order to advance the aims of the Enterprise.

297.     Defendants did sign checks without authorization and utilized forged instruments and false financial records to obtain bank accounts and financing for Northshore, Sunrise, and Superb without the authority to do so, constituting wire fraud.

298.     Defendants' shared objective was and is to divert funds to their own benefit and to defraud Plaintiffs.

299.     Plaintiffs reasonably and justifiably relied upon Defendants' false representations, false pretenses and deceptive communications, and have been damaged as a direct and proximate result of Defendants' participation in such enterprise, as alleged herein.

300. The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of defrauding the Project.

301. S. Deo managed and controlled the improperly-opened bank account in which Superb's funds were diverted.

302. Dwight Blankenship and Marc Merckling each misappropriated cash payments and abused their authority as former or active police officers in carrying out their actions at the behest of Deo.

303. Laurie enabled Defendants by substantially assisting them in opening a bank account at Flushing Bank, with whom Laurie has a relationship through his business DLA Capital Partners Inc.

304. Jones filed tax returns on behalf of Superb stating that its sole shareholder was Deo.

305. Finally, Thomasson serves as counsel to the Defendants and substantially assists them in carrying out their unlawful schemes by defending their blatantly criminal conduct despite knowing that Defendants have engaged in fraud.

306. In fact, Thomasson helped divert the stolen funds.

307. The raison d'etre of this fraud was to extract money from Plaintiffs and leave them holding the liabilities for Defendants' conduct.

308. It is prototypical racketeering – i.e., creating a problem (incurring liabilities and taking away the ability to pay those liabilities) for the purpose of solving it through extortion (attempting to obtain or obtaining both operational control and/or ownership of dealerships).

309.    Each defendant benefitted directly from these schemes either through direct participation in Deo's schemes by receiving portions of the money stolen by Deo.

310.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily activities, i.e., buying and selling vehicles from outside the State of New York.

311.    All communications between the members of the Enterprise, were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications.

312.    Specifically, the Enterprise used interstate emails to communicate and collect monies purportedly owed for made up sales of automobiles that were never actually sold.

313.    Plaintiffs have and will continue to be injured in their businesses and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

314.    The injuries are proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars paid as a result of Defendants' fraudulent conduct.

315.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

316.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

### AS AND FOR THEIR SECOND CAUSE OF ACTION
(Conspiracy Under 18 U.S.C. § 1962(d) – All Defendants)

317.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

318.   Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

319.   By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the dealerships, purchase and sale of vehicles, opening of bank accounts, and issuing of checks, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.

320.   Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy in violation of 18 U.S.C. § 1962(c).

321.   Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to defraud the Sponsor, including in violation of 18 U.S.C. § 1962(c).

322.   In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the schemes to steal monies and assets of the dealerships, as well as to obtain operational control of the dealerships.

323.   The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

324.   Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

325.     The injuries to Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars.

326.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

327.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

328.     The Court should also enter such equitable relief as it deems just and proper to preclude the Defendants from continuing in their illegal activity.

## AS AND FOR THEIR THIRD CAUSE OF ACTION
(Injunctive Relief Under RICO, 18 U.S.C. § 1964(a))

329.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

330.     Plaintiffs have sustained or are immediately in danger of sustaining direct injury as the result of the challenged conduct.

331.     Namely, because Defendants have misappropriated vehicles owned by Superb purchased with floor plan financing with various lenders, Plaintiffs will be required to shut down its operations if Defendants do not immediately return the vehicles.

332.     Due demand has been made for the return of the vehicles, both by Superb and its various lenders, but Defendants have willfully refused to return the vehicles.

333.     Accordingly, Superb is entitled to an injunction, pursuant to 18 U.S.C. 1964(a), requiring Defendants to return Superb's vehicles, in order to prevent continued actual and threatened harm arising out of the challenged conduct.

## AS AND FOR THEIR FOURTH CAUSE OF ACTION
**(Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 – Deo & S. Deo)**

334.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

335.    Defendants' actions, as set forth herein, constitute misappropriation under the DTSA, 18 U.S.C. § 1836.

336.    Defendants possess trade secrets and confidential information belonging to Plaintiff, including the identity of all of its customers, contact information, financial information, and Superb's customized DMS system information.

337.    Plaintiffs have made and make reasonable efforts to maintain the secrecy of this information including limiting its disclosure to those who owe a fiduciary duty to the dealerships, i.e., Deo.

338.    Defendants had no authority to utilize confidential information and trade secrets of Superb.

339.    The confidential information and trade secrets belonging to Superb that Defendants possess derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

340.    Indeed, Defendants utilized this very information as a road map to open a competing group of dealerships and to unfairly compete against Superb in dastardly fashion.

341.    Defendants knew that this information contained confidential information and trade secrets belonging to Superb.

342.    Defendants have no right to retain or use any of Superb's trade secrets or other confidential and proprietary information due to their illegal conduct.

343.     Upon information and belief, Defendants are retaining and using Superb's confidential information and trade secrets to compete with Superb; Superb did not consent to Defendants' use of the information as set forth above.

344.     At all relevant times, Defendants knew that the information obtained by them contained Superb's proprietary trade secrets that they had no right to receive and could not receive absent their improper acts. Defendants' conduct thus constitutes knowing, willful, and malicious misappropriation.

345.     Defendants have used Superb's confidential information and trade secrets to sell vehicles, through interstate commerce, and compete with Plaintiffs, causing substantial loss of sales to Plaintiffs and damage to its relationships with its clients and the potential obliteration of the Plaintiffs' dealerships.

346.     Defendants have wrongfully acquired and used Superb's confidential information and trade secrets and continue to do so, without the express or implied consent of Superb, for Defendants' own benefit and the benefit of others.

347.     The public policy in favor of protecting Superb's interest in maintaining its trade secrets outweighs any interest Defendants could have in using Superb's confidential information and trade secrets.

348.     As a direct and proximate result of Defendants' misappropriation of Superb's confidential information and trade secrets, Superb has suffered and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the loss of its brand recognition and goodwill with its clients, and will continue to suffer said injury, loss, harm or damage unless and until Defendants are restrained from their continued misappropriation of confidential information and trade secrets.

## AS AND FOR THEIR FIFTH CAUSE OF ACTION
### Injunctive Relief under the DTSA (18 U.S.C. § 1836, *et seq.* – All Defendants)

349.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

350.    Superb operates its business in interstate commerce in New York, New Jersey, Pennsylvania, and other states, by selling vehicles to customers in those states, and the trade secrets misappropriated by Defendants are related to, and intended for use in, interstate commerce.

351.    As set forth above, Defendants improperly acquired Superb's trade secrets, including information regarding its business, operations, services, customers, pricing, sales and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone except those with a fiduciary duty who were obligated to keep this information confidential.

352.    The aforementioned information qualifies as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).  The misappropriated documents concern Plaintiff's operations, services, customers, pricing, sales and marketing strategies, including financial, business, and economic information, plans, methods, techniques, procedures, formulas and processes.

353.    Furthermore, Superb has taken reasonable measures to keep such information secret by, among other things, limiting highly sensitive information to those who have a fiduciary duty to Superb.

354.    The trade secrets misappropriated by Defendants include those which required substantial resources, time, and investment by Superb to create and/or develop, and thus derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information.

355.    Defendants' misappropriation of Superb's trade secrets has caused Superb to suffer harm, including but not limited to the loss of clients, loss of reputation, damage to their brand, and customer goodwill, and loss of the confidentiality of, and investment in, its trade secrets.   This harm cannot be adequately remedied at law and requires injunctive relief.

356.    Superb will suffer irreparable and imminent harm in the absence of a permanent injunction; Defendants' continued misappropriation of Superb's trade secrets and failure to return Superb's documents containing Trade Secrets, including Superb's customer information, will cause Superb further loss of clients, customers, accounts and/or market share.

357.    This imminent injury is neither remote nor speculative, because Superb has already been harmed in precisely this manner by Defendants' misappropriation and use thereof, and will continue to be irreparably harmed in the absence of a permanent injunction.

358.    Defendants will not suffer harm from the rightful return of Plaintiffs' proprietary information and trade secrets, and will not be prevented from conducting their ordinary business by lawful means; Defendants will merely be prevented from continuing to gain an unfair and unlawful advantage at Plaintiffs' expense.  The ongoing, continuing and future harm to Plaintiffs cannot be adequately remedied at law and requires permanent injunctive relief.

359.    The public interest would not be disserved by the issuance of an injunction preventing Defendants from misappropriating Plaintiffs' Trade Secrets.

360.    Accordingly, Plaintiffs are entitled to an injunction, pursuant to 18 U.S.C. 1836(b)(3)(A), enjoining Defendants from continuing to use Plaintiff's trade secrets, in order to prevent continued actual and threatened misappropriation of Plaintiffs' trade secrets, and requiring Defendants to return and/or destroy the trade secrets improperly accessed and retained by Defendants, pursuant to 18 U.S.C. 1836(b)(3)(A)(ii).

## AS AND FOR THEIR SIXTH CAUSE OF ACTION
### (Misappropriation – All Defendants)

361.   Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

362.   Defendants' actions, as set forth herein, constitutes misappropriation under New York law.

363.   Defendants currently possess information belonging to and used in the operation of Plaintiffs' businesses, which information constitutes confidential, proprietary and trade secret information under New York law.

364.   Such information was developed by Plaintiffs through great effort and expense, in terms of manpower, time, and costs, and is extremely valuable to Plaintiffs, as it is crucial to the operation of its business, cannot be easily acquired or duplicated by others, and, if made available to others, would enable competition with Plaintiffs to their detriment.

365.   Plaintiffs make reasonable efforts to maintain the secrecy of this information including limiting its disclosure to those who have a fiduciary duty to Plaintiffs.

366.   Upon information and belief, Defendants knowingly and improperly obtained and used such trade secrets and confidential information for their own benefit.

367.   The improperly retained information constitute trade secrets and Defendants' actions pose a real and actualized risk that they will and have misappropriated these secrets by using the information to their advantage or for their own personal economic gain and with the willful and malicious intent to injure Plaintiffs' business and their brand.

368.   As a result, Plaintiffs have suffered direct and consequential damages, and are entitled to recover compensatory damages, including opportunity costs and punitive damages in an amount to be proven at trial.

## AS AND FOR THEIR SEVENTH CAUSE OF ACTION
### (Unfair Competition – All Defendants)

369.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

370.    Through Defendants' misappropriation of Plaintiffs' confidential trade secrets, Defendants have stolen customers and poached employees and employed them while they were solely being paid by Superb to work solely for Superb to serve their own group of dealerships.

371.    As a result of Defendants' use of the trade secrets they misappropriated to obtain a competitive advantage against Plaintiffs, Defendants have caused economic damages to Plaintiffs along with diminishing their goodwill.

## AS AND FOR THEIR EIGHTH CAUSE OF ACTION
### (Tortious Interference with Contracts, business relations, and prospective economic advantage – All Defendants)

372.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

373.    Plaintiffs have entered into valid written agreements with its vendors, customers, and employees concerning their businesses.

374.    Defendants were at all relevant times aware of these agreements between Plaintiffs and their banks, vendors, customers, and employees.

375.    Defendants engaged in conduct designed to damage those relationships.

376.    For example, Defendants double-floored vehicles in violation of their contracts with Plaintiffs' floor plan lenders knowing that doing so would constitute a breach of those agreements.  As another example, Defendants diverted customers away from Plaintiffs to other dealerships owned or operated by Defendants.

377.     As yet another example, Defendants poached employees away from Plaintiffs to other dealerships owned or operated by Defendants, some of which were poached while those employees remained on Plaintiffs' payroll, such that Defendants interfered with Plaintiffs' employment relationship with their employees.

378.     As a consequence of Defendants' acts to sabotage Plaintiffs' relationships with vendors, customers, and employees of Plaintiffs for their benefit, they have been injured, for which they are entitled to recover damages including but not limited to financial loss, loss of good will and reputation, compensatory and special damages, interest and punitive damages in an amount as the proof at a trial may warrant that were directly caused by Defendants' misconduct.

379.     Defendants' conduct was intentional, willful, and malicious, thus justifying the award of punitive damages and/or exemplary damages.

## AS AND FOR THEIR NINTH CAUSE OF ACTION
### (Conversion – All Defendants)

380.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

381.     Plaintiffs have a possessory right and legal ownership to their vehicles, dealer plates, confidential information, and trade secrets referenced herein.

382.     Defendants exercised unauthorized dominion over Plaintiffs' vehicles, dealer plates, confidential information, and trade secrets.

383.     Defendants willfully exercised unauthorized dominion over Plaintiffs' vehicles, dealer plates, confidential information, and trade secrets to the detriment of Plaintiff.

384.     Defendants' unauthorized dominion over Plaintiffs' confidential information and trade secrets was and is to the exclusion of Plaintiffs' rights.

385.    Defendants' unauthorized dominion over Plaintiffs' confidential information and trade secrets constitutes conversion.

386.    Defendants have thus committed the tort of conversion under New York common law.

## AS AND FOR THEIR TENTH CAUSE OF ACTION
### (Civil Conspiracy – All Defendants)

387.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

388.    Defendants conspired with each other for an unlawful purpose, to wit: obtaining Plaintiffs' confidential information and developing a business to compete with Plaintiff using Plaintiffs' confidential information obtained through fraud.

389.    Defendants have entered into a civil conspiracy to engage in, *inter alia*, misappropriation, unfair competition, unjust enrichment, and tortious interference with contract.

390.    Defendants each agreed to this common goal and acted in concert with the specific object of harming Plaintiffs for their own personal gain.

391.    Each Defendant performed an overt act in furtherance of the conspiracy.

392.    The unlawful alleged herein, including acts directed into the State of New York, were committed in furtherance of that conspiracy.

393.    As a result of the Defendants' combined, concerted, and continued efforts, Plaintiffs were, are, and continue to be damaged.

394.    As a consequence of Defendants' acts to steal from Plaintiffs, they have been injured, for which they are entitled to recover damages including but not limited to financial loss, loss of good will and reputation, compensatory and special damages, interest and punitive damages, in an amount to be determined at trial, directly caused by Defendants' misconduct.

## AS AND FOR THEIR ELEVENTH CAUSE OF ACTION
### (Professional Malpractice & Fraud – Jones and Jones CPA LLP)

395.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

396.    Under standards of care and conduct prevailing in the accounting industry generally and applicable to Jones and Jones CPA LLP specifically, Jones and Jones CPA LLP had an affirmative duty to Plaintiffs to undertake each and every one of its tasks for Plaintiffs with caution and care, to be vigilant for discrepancies or irregularities and to report any such findings to Plaintiffs accordingly.

397.    In addition, under Article V of the Principles of Professional Conduct of the AICPA Code of Professional Conduct, Jones and Jones CPA LLP owed Plaintiffs an affirmative duty to identify and inform Plaintiffs of any fraud red flags, such as suspicious activities or internal control deficiencies.

398.    As set forth above more fully, Jones and Jones CPA LLP failed to exercise independence and due professional care in a variety of ways, including without limitation failing to notice, investigate and/ or report to Urrutia the existence of Deo's scheme to create a false record that he is the 100% owner of the Plaintiffs' dealerships and to fail to report missing cash that was never deposited into Plaintiffs' dealership bank accounts despite seeing cash receipted in to the dealerships' DMS systems.

399.    In fact, Jones and Jones CPA LLP knew or should have known that the information provided or reviewed by them were false and nonetheless reported to Plaintiffs that the dealership bank accounts were balanced and that there were no discrepancies or issues.

400.    Jones and Jones CPA LLP therefore participated in the fraud at the behest of Deo and the remaining Defendants.

401.     Jones and Jones CPA LLP's wrongful and deficient conduct proximately caused Plaintiffs to suffer damages which are more fully set forth above by failing to cause Plaintiffs to arrest such misconduct earlier or in a preventative manner.

402.     All such losses were reasonably foreseeable at the time Jones and Jones CPA LLP were retained to provide accounting services.

403.     As a result of Jones and Jones CPA LLP's professional malpractice and fraud, Plaintiffs have suffered, and continue to suffer, damages in an amount to be established at trial, but in no event less than $10 million, plus interest and reasonable attorney's fees, all of which continue to accrue.

## AS AND FOR THEIR TWELFTH CAUSE OF ACTION
### (Permanent Injunction – Against Libertas)

404.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

405.     Libertas claims ownership over Northshore's Future Receipts.

406.     Libertas' ownership over Northshore's Future Receipts is not legitimate.

407.     Plaintiffs seek a judgment permanently enjoining Libertas from exercising any rights over Northshore's Future Receipts.

## AS AND FOR THEIR THIRTEENTH CAUSE OF ACTION
### (Article 4-A of the New York UCC – Against Flushing Bank)

408.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

409.     The fraudulent transfers at issue were not authorized.

410.     Defendants did not have authority to make transfers or sign checks on behalf of Superb, Northshore, or Sunrise.

411.    Deo and the remaining Defendants lacked apparent authority to enter into the fraudulent transfers because Flushing Bank knew, or should have known, that Urrutia is the majority shareholder, had sole check authorization, and sole control of bank accounts based on the signature card for Superb's bank accounts and prior meetings with agents of Flushing Bank.

412.    Similarly, Deo and the remaining Defendants lacked apparent authority to enter into the fraudulent transfers because Flushing Bank knew, or should have known, that Deo had no membership interest in Northshore or Sunrise.

413.    A commercially reasonable actor, and certainly a sophisticated bank like Flushing Bank, would have been alerted to the fact that the transfers were fraudulent and, thus, unauthorized.

414.    At a minimum, the suspicious or unusual account activity would have led a commercially reasonable actor to make further inquiries.

415.    If those inquiries were made, they would have confirmed that Deo lacked actual authority.

416.    The New York Uniform Commercial Code ("UCC") provides in pertinent part:

If a receiving bank accepts a payment order issued in the name of its customer as sender which is (a) not authorized and not effective as the order of the customer under [§] 4-A-202, . . . the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount …

See UCC § 4-A-204(1).

417.    Because the fraudulent transfers were not authorized, Flushing Bank is required to refund the transfers pursuant to Article 4-A of the N.Y. U.C.C. because Flushing Bank cannot establish that it (i) followed commercially reasonable and agreed upon security procedures; and (ii) acted in good faith and in accordance with the reasonable expectations of the parties.

418.     As a result, section 4-A-204(1) of the N.Y. U.C.C. requires that Flushing Bank refund the payment orders made by Defendants, plus interest.

419.     To date, Flushing Bank has failed to comply with Section 4-A-204(1) by refusing to refund the payment orders made by Defendants to Plaintiffs.

420.     As a direct and proximate result of Flushing Bank's breaches of its duty, Plaintiffs have suffered damages in an amount to be determined at trial.

## AS AND FOR THEIR FOURTEENTH CAUSE OF ACTION
### (Negligence – Against Flushing Bank)

421.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

422.     As customers of Flushing Bank, Flushing Bank owed Plaintiffs a duty of care, independent of any contractual agreement, to act in a manner consistent with commercially reasonable standards.

423.     Flushing Bank violated this duty of care by, among other things, failing to follow their own "Know Your Customer" procedures.

424.     Flushing Bank had actual knowledge that Urrutia was the majority shareholder of Superb and sole member or shareholder of his remaining dealerships because Urrutia previously provided Flushing Bank with all information concerning his ownership interest in Superb.

425.     As a result, Flushing Bank should have known that Deo's application to open an account with Flushing Bank was fraudulent because it falsely stated that he was the sole shareholder of Superb.

426.     As a direct and proximate result of Flushing Bank's breaches of its duty, Plaintiffs have suffered damages in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

427.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in its favor as against Defendants as follows:

a.    Awarding treble damages resulting from Defendants' violation of 18 U.S.C. § 1962;

b.    Awarding injunctive relief in returning operational control, vehicles, dealer plates, and any other assets of Plaintiffs pursuant to 18 U.S.C. § 1964(a);

c.    Injunctive relief restraining and enjoining Defendants from further violations of RICO and the DTSA, including the use of confidential information or trade secrets of Plaintiffs, and unfairly competing with Plaintiffs in any manner;

d.    Injunctive relief restraining and enjoining Defendants from having any contact with Plaintiffs' current and/or former employees;

e.    Compensatory damages for misappropriation of Plaintiffs' goodwill, misappropriation and unfair competition, violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § 1962, Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, misappropriation, unfair competition, tortious interference with contract, business relations, and prospective economic advantage, conversion, civil conspiracy, professional malpractice, fraud, according to proof at trial, including but not limited to, lost profits, disgorgement of all profits and revenues received by Defendants, and – to the extent calculable – damages for reputational damage, lost customers, lost relationships, lost revenue, loss of goodwill, corrective advertising, and all other available damages;

f.    Ordering that Defendants return all of Plaintiffs' confidential and proprietary information, including a forensic examination of all of Defendants' computing devices, cellular phones, and cloud storage sites;

g.    Prohibiting the Defendants or their agents from selling vehicles to Plaintiffs' customers, whether directly or indirectly;

h.    Punitive and exemplary damages in an amount to be determined at trial in this case;

i.    Interest (pre-judgment & post-judgment);

j.    Equitable relief in the form of the imposition of an injunction, constructive trust, accounting, and a disgorgement of profits and other benefits received by reason of the unlawful conduct complained of herein;

k.    Enjoining Defendants from operating their enterprise by virtue of their illegal conduct since they were created entirely through theft of Plaintiffs' businesses;

l.    Ordering that Defendants pay the costs of suit, including attorneys' fees; and

m.    Such other and further relief as this Court deems just, equitable, and proper.

Dated: Lake Success, New York
      August 16, 2023                     Respectfully submitted,

**MILMAN LABUDA LAW GROUP PLLC**

                /s
           _____
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 303-1395 (direct dial)
(516) 328-0082 (facsimile)
emanuel@mllaborlaw.com

*Attorneys for Plaintiffs*
*Superb Motors Inc.,*
*Team Auto Sales LLC, &*
*Robert Anthony Urrutia*

Dated: New York, New York
      August 16, 2023

**CYRULI SHANKS & ZIZMOR LLP**

_____/s_____
Jeffrey Ruderman, Esq.
420 Lexington Avenue, Suite 2320
New York, NY 10170-0002
(212) 661-6800 (office)
(347) 379-4622 (direct dial)
(212) 661-5350 (facsimile)
jruderman@cszlaw.com

*Attorneys for Plaintiffs*
*189 Sunrise Hwy Auto LLC,*
*Northshore Motor Leasing, LLC,*
*1581 Hylan Blvd Auto LLC,*
*1580 Hylan Blvd Auto LLC,*
*1591 Hylan Blvd Auto LLC,*
*1632 Hylan Blvd Auto LLC,*
*1239 Hylan Blvd Auto LLC,*
*2519 Hylan Blvd Auto LLC,*
*76 Fisk Street Realty LLC,*
*446 Route 23 Auto LLC,*
*Island Auto Management, LLC,*
*Brian Chabrier,*
*Joshua Aaronson, and*
*Jory Baron*