# Exhibit "B"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
AUTOEXPO ENT. INC., PEACE PROPERTIES LLC, NETWORK REINSURANCE COMPANY INC., AUTO EXCHANGE CENTER, LLC, and CHROME INSURANCE AGENCY LLC,

                                             Case No.: 2:23-cv-9249

                                    Plaintiffs,

                                             FIRST AMENDED **COMPLAINT**

                    -against-

OMID ELYAHOU, SIMPSOCIAL LLC, UNITED CITIZENS WARRANTY LLC, FIFTY SEVEN CONSULTING CORP. d/b/a CERTIFIED AUTO GROUP a/k/a CERTIFIED PERFORMANCE MOTORS, AVI EITAN, and FAZEEDA KASSIM,

                                    Defendants.
-------------------------------------------------------------------X

Plaintiffs, AutoExpo Ent. Inc. ("AutoExpo"), Peace Properties LLC ("Peace"), Network Reinsurance Company Inc. ("Network Reinsurance"), Auto Exchange Center, LLC ("AEC"), and Chrome Insurance Agency LLC ("Chrome," collectively, "Plaintiffs"), by and through their attorneys, Milman Labuda Law Group PLLC, as and for their First Amended Complaint against Defendants Omid Elyahou ("Elyahou"), Simpsocial LLC ("SimpSocial"), United Citizens Warranty LLC ("United Citizens"), Fifty Seven Consulting LLC d/b/a Certified Performance Motors ("Certified Performance"), Avi Eitan ("Eitan"), and Fazeeda Kassim ("Kassim") hereby allege as follows:

## NATURE OF THE CASE

1.    Elyahou, the former brother-in-law of AutoExpo's majority owner, Michael Shahkoohi ("Shahkoohi"), was entrusted with an equity stake in AutoExpo when he was in his mid-twenties, in return for his promise to manage and run AutoExpo's day-to-day operations.

2.    But, apparently not satisfied with the prospect of sharing with his co-owner(s),

Elyahou proceeded to outright loot AutoExpo.

3.      Among other things, Elyahou treated AutoExpo's assets as his personal piggy bank, taking cash advances from AutoExpo's company credit card, and taking cash from repossession ("repo") companies that belonged to AutoExpo for himself, all the while claiming that AutoExpo did not make enough money to make any distributions.

4.      In addition, Elyahou, who was in charge of AutoExpo's marketing – and was compensated for those efforts by and through his employment for AutoExpo – created a separate company, SimpSocial, for social media marketing, without authority, and without telling Shahkoohi or anyone at AutoExpo, he proceeded to change the platform that AutoExpo had used and to charge AutoExpo exorbitant monthly fees through SimpSocial that dwarfed the fees charged by the prior company's platform.

5.      As if this was not bad enough, Elyahou stole proprietary technology that AutoExpo spent years developing at significant corporate cost, and utilized the information from AutoExpo's proprietary technology, as well as its confidential customer leads and bids, to directly compete against AutoExpo.

6.      Elyahou not only stole AutoExpo's funds and customers, he also poached its employees.

7.      In this regard, Elyahou enlisted the aid and participation of the other Defendants, who are (or whose principals are) former employees of AutoExpo.

8.      Those co-Defendants have joined in the outrageous schemes to loot AutoExpo.

9.      Also, Elyahou, despite his ownership and position at AutoExpo, formed an entity, United Citizens, which, among other things, sold warranty products and made auto financing available to other dealerships that increased their competition with AutoExpo and was directly at

odds with AutoExpo's interests.

9. 10.     On or about March 30, 2023, Elyahou agreed to relinquish management of AutoExpo, but – to date – he has refused to return AutoExpo's confidential and proprietary information, despite AutoExpo's due demand.

10. 11.     ~~Defendants' brazen schemes, carried out by engaging in fraud, must be stopped.~~ In addition, Plaintiffs learned during their investigation that, Elyahou, in collusion with Kassim, improperly, used their position as Fiduciaries of the AutoExpo 401(k) Profit Sharing Plan (the "Plan") to fleece the Company and expose it to liability in gross violation of his obligations under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Among other improper conduct as set forth below, Elyahou, without ownership's approval, amended the Plan with a falsified board resolution, creating unauthorized company matches to ingratiate himself to Kassim and others, and with the complicity of Kassim, moved the Plan from its previous Administrator to a new Administrator, all without authority. Then, in November 2022, shortly before Elyahou agreed to relinquish management of AutoExpo, Elyahou, with Kassim's assistance, engaged in a tax evasion scheme by having over $500,000 withdrawn from Plan so that he could purchase a $2 ½ million home in Great Neck, NY, without having any proper documentation for a loan or withdrawal as it was a taxable event exposing AutoExpo and requiring corrective action.

11. 12.     This is an action for damages and injunctive relief related to Defendants' unlawful conspiracy and scheme to engage in fraud and breach fiduciary duties, by, among other things, (i) improper poaching of AutoExpo's employees~~ and~~: (ii) misappropriating AutoExpo's confidential information and trade secrets ~~resulting in Defendants' (i)~~ in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"); ~~(ii) misappropriation of~~ (iii) misappropriating trade

secrets; (iiiiv) unfair competition; (ivv) tortious interference with contractual relations, business relations, and prospective economic advantage; (vvi) unjust enrichment; (vivii) conversion; (viiviii) fraud; (viiiix) breach of fiduciary duty; and (ix(x) civil conspiracy; and (xi) exposing AutoExpo to tax liabilities and penalties in violation of ERISA.

12.13.   Defendants' scheme to infiltrate and leech off of Plaintiffs' business, causing Plaintiffs irreparable harm, must be stopped.

13.14.   Specifically, Defendants must be prevented from operating businesses that were formed solely through Defendants' fraudulent schemes and utilizing Plaintiffs' confidential information and trade secrets stolen by the Defendants who have utilized Plaintiffs' employees and Plaintiffs' trade secrets to compete against Plaintiffs.

14.15.   In addition to being enjoined from their conduct, which has significantly threatened Plaintiffs' businesses, Defendants must pay for damages for the harm they have caused to Plaintiffs' businesses.

**PARTIES**

15.16.  At all times hereinafter mentioned, Plaintiff AutoExpo was and still is a domestic corporation duly formed and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 46 Northern Boulevard, Great Neck, New York.

16.17.  Shahkoohi is the majority shareholder of AutoExpo.

17.18.  At all times hereinafter mentioned, Plaintiff Peace was and still is a domestic limited liability company duly formed and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 46 Northern Boulevard, Great Neck, New York.

18.19.  The members of Peace are Shahkoohi, Elyahou, and Ramin a/k/a Robert Baratian ("Robert").  Each of the members of Peace resides in the State of New York.

19.20.  Peace owns AutoExpo's Service Department located at 1800 Jericho Turnpike, New Hyde Park, New York.

20.21.  At all times hereinafter mentioned, Plaintiff Network Reinsurance was and still is a Delaware tribe of nations corporation, with its principal place of business at 46 Northern Boulevard, Great Neck, New York.

21.22.  At all times hereinafter mentioned, Plaintiff AEC was and still is a domestic limited liability company duly formed and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 50 Northern Boulevard, Great Neck, New York.

22.23.  Upon information and belief, the members of AEC are Shahkoohi and Elyahou.

23.24.  Each of the members of ACEAEC resides in the State of New York.

24.25.  At all times hereinafter mentioned, Plaintiff Chrome was and still is a domestic limited liability company duly formed and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 56 Northern Boulevard, Great Neck, New York.

25.26.  Upon information and belief, the members of Chrome are Shahkoohi and Elyahou.

26.27.  Each of the members of Chrome resides in the State of New York.

27.28.  Upon information and belief, Elyahou is an individual who resides in the State of New York within the County of Nassau.

28.29.  At all times relevant, SimpSocial is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in New

York County, New York.

29.30.   Upon information and belief, Elyahou is the sole member of SimpSocial.

31.      At all times relevant, United Citizens is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in New York County, New York.

32.      Upon information and belief, Elyahou is the sole member of United Citizens.

30.33.   Upon information and belief, Eitan is an individual who resides in the State of New York within the County of Nassau.

31.34.   At all times relevant, Certified Performance is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

32.35.   Upon information and belief, Eitan is the sole member of Certified Performance.

33.36.   Upon information and belief, Kassim is an individual who resides in the State of New York within the County of Nassau.

## JURISDICTION AND VENUE

34.37.   This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, given that Plaintiff pursues claims under federal law, the DTSA, including under the DTSA, as well as Sections 402(b)(3), 404(a)(1), 406(b) and 502(a)(3), (e)(1) and (f) of ERISA.

35.38.   Further, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's state law claims against Defendants because they are part of the same case or controversy and arise under a common nucleus of operative facts.

36.39.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because

a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district, and each of the Defendants resides in this district. In addition, venue is proper as to Elyahou and Kassim pursuant to Section 502(e)(2) and other sections of ERISA.

## FACTS

**Shahkoohi Takes Young Brother-In-Law, Elyahou, Under His Wing, Makes Him Manager, and Then, Operating Partner**

37.40. Shahkoohi has been in the automobile dealership business for over three (3) decades and operates several dealerships.

38.41. In or about 1994, Shahkoohi first met Elyahou at his bar mitzvah during a family event.

39.42. At the time, Shahkoohi was courting Elyahou's sister, Sharona Elyahou ("Sharona"), who he married in 1995.

40.43. Since Elyahou was part of his wife's family, Shahkoohi took Elyahou under his wing and trained him in the auto dealership business.

41.44. Elyahou had absolutely no business experience, and the Elyahou family was struggling financially.

42.45. So, in the late 1990s, when Elyahou was a teenager, Shahkoohi offered Elyahou the opportunity to have Omid work part time at a his dealership that he managed.

43.46. Within about one year, Elyahou became a salesperson.

44.47. As a salesperson, Elyahou was making approximately $24,000.00 a year.

45.48. However, since Elyahou was family, by marriage, Shahkoohi looked for additional opportunities for him.

46.49. From approximately 2000 the late 1990s until January 12, 2023, Shahkoohi provided Elyahou with increasing responsibilities and compensation.

47.50.  So, in mid-to-late 1999, as a result of business expansion, Shahkoohi offered Elyahou, who was then only 18 years old, a manager position at a new location, 46 Northern Boulevard, Great Neck, New York, where AutoExpo now operates.

48.51.  The offer more than doubled Elyahou's compensation, to $52,000.00 a year, and included increases of approximately $10,000.00 per year thereafter for five years.

49.52.  Elyahou accepted the offer.

50.53.  AutoExpo was formed in New York on October 22, 1999.

51.54.  It became operational as a used car dealership sometime in 2000.

52.55.  At that time, Omid was 19 years old, and without any financial resources.

53.56.  In 2002, Elyahou married Neda Shilian ("Neda").

54.57.  Then, in 2006, Elyahou was granted a twenty- percent (20%) share of AutoExpo and became its "Operating Partner."

55.58.  Elyahou was required to bring twenty- percent (20%) cash into the business as a capital contribution, but never delivered the full amount.

56.59.  At the time, Shahkoohi and his business partners fully trusted Elyahou as he was a family member (i.e., as Shahkoohi's brother-in-law).

57.60.  Shahkoohi and his business partners also felt that they, in essence, raised him from the time he was fifteen (15) years old, such that they placed their trust in him fully.

58.61.  After Elyahou was elevated to the position of minority-shareholding Operating Partner, Shahkoohi and his partners agreed, collectively, that he could withdraw $150,000 annually against his twenty percent (20%) share of the profits, and that Shahkoohi and his partners would withdraw eighty percent (80%) against their collective share.

**The September 2008 Agreement And Respective Roles And Duties**

[8]

59.62.  On or about September 29, 2008, Elyahou executed a simple two-page agreement that applied to AutoExpo and Peace (the "2008 Agreement"), where the foregoing was outlined, and continued as its "Operating Partner;" the agreement also applied to Peace.").

63.     Under the 2008 Agreement, Elyahou continued as its "Operating Partner."

60.64.  Under the 2008 Agreement, Elyahou was "in charge of new ideas & investments & he may not enter into any other partnership or any other business (directly or indirectly) other than AutoExpo & its subsidiaries."

61.65.  EveryUnder the 2008 Agreement, every year, "all inside accounts" were required to be "brought up to date."

62.66.  IfUnder the 2008 Agreement, if Elyahou desired to "leave the partnership," he would be required to sell his share "at the cash value of merchandise & money in the bank of the company," and would not be eligible "for non-cash value of the business."

63.67.  Under the 2008 Agreement, Elyahou was also in charge of marketing and managing AutoExpo.

64.68.  Pursuant to the 2008 Agreement, Shahkoohi's long-time business partner and cousin, Ramin "Robert" Baratian (hereinafter "Robert"), and Shahkoohi were the Senior Advisors to the company and every decision had to be approved by at least one of them.

69.     In accordance with the above, at no time was Elyahou permitted to make major decisions (such as changes to a 401(k) plan) independently.

65.70.  Around the same time, Elyahou requested a draw of $180,000.00 per year (instead of $150,000.00) against his twenty- percent (20%) share.

66.71.  Elyahou's request for a higher draw was authorized, in anticipation that the eighty percent (80%) share of the profits would be forthcoming imminently.

67.72.  Collectively, Robert, ~~Elyahou,~~ and Shahkoohi ~~made~~were supposed to be the individuals exclusively making decisions as to the business, including draws and salaries; with Elyahou~~, however, had~~ having primary control ~~of~~only over the day-to-day operations.

68.73.  By way of example, Elyahou had responsibility over AutoExpo's business relationship with the bank, Rockland Trust Bank ("Rockland"), which provided critical financing for AutoExpo's inventory under a floor plan line of credit.[1]

69.74.   Also, for example, Elyahou was responsible for managing AutoExpo's business relationship with Dealertrack.

70.75.  At all times, although Elyahou was tasked with operations, Shahkoohi remained involved in the business; carrying out his responsibilities and giving Elyahou's the freedom to carry out his role. This, of course, was under the impression that Elyahou would hold his fiduciary responsibilities in high regard keeping the best interest of the business in all his decisions.

71.76.  So, for instance, Shahkoohi was always the "buyer" for AutoExpo and other affiliated dealerships in which Shahkoohi had an ownership interest to purchase vehicles for resale.

72.77.  As the buyer, Shahkoohi would attend the live simulcast of Mercedes Benz On Demand (or "MB On Demand") auction platform, which is held at 1:00 P.M., every day, Monday through Friday.

73.78.  Prior to the auction, Shahkoohi would regularly call Elyahou at approximately 12:45 P.M. to advise him of the vehicles that he had selected for AutoExpo to bid on as well as the bid range.

---

[1] Dealerships typically operate with the assistance of banks who provide "floor plan" financing, which is collateralized by the vehicles available for sale at the dealership.  When a dealership obtains such financing, the bank that provides same perfects a security interest in the vehicles chosen and certain rules attach as a condition of the financing.  In essence, "floor plan" financing is a credit line for dealerships to purchase vehicles for the purpose of reselling them. Once a vehicle is sold, the dealership must repay the bank the principal amount for each vehicle plus interest and any applicable fees.

**Elyahou's ~~Affair/~~Divorce, AutoExpo's Investment, and Elyahou's Lack of Productivity**

~~74.~~79.  As time went on, Elyahou made withdrawals for his own benefit on, approximately, a monthly basis.

~~75.    He bought a sizable house in Roslyn Heights, took frequent (sometimes monthly) vacations, and began living a rather lavish lifestyle.~~

~~76.~~80.  AutoExpo was selling many cars, but when Shahkoohi and his business partners sought to withdraw their share, Elyahou always had a reason to argue that AutoExpo is short on cash and needed the money to buy cars and save on floor plan financing costs.

~~77.    In 2012, Neda claimed that Elyahou was having an affair with her best friend, Sharona Hebroni ("Hebroni").~~

~~78.    Shortly thereafter, Neda served Elyahou with divorce papers.~~


81.    Meanwhile, ~~to~~In or around 2007 or 2008, AutoExpo hired Kassim as Controller.

82.    From the moment of her employment with AutoExpo, Kassim knew that Shahkoohi was an owner and was entitled to know all details about the company.

~~79.~~83.  To help AutoExpo (and Elyahou) succeed, from approximately 2009 through 2014, AutoExpo spent an estimated $50,000.00 to develop its proprietary AutoExpo Inventory System.

~~80.~~84.  Meanwhile, in ~~or around 2007 or 2008, AutoExpo hired Kassim~~2012, Elyahou had a divorce proceeding started against him.

~~81.1.    From the moment of her employment with AutoExpo, Kassim knew that Shahkoohi was an owner and was entitled to know all details about the company.~~

~~82.~~85.  From 2012 until approximately, 2017, Elyahou's work on behalf of the AutoExpo dealership suffered, but Shahkoohi remained supportive of ~~Elyahou because he knew that the~~

~~divorce was emotionally tough during what was understandably a difficult time for him~~him in light of his personal issues.

~~83.~~86.  During this time period, Elyahou suggested that AutoExpo was only selling around seventy (70) cars per month, and that, with overhead, the dealership was unable to turn a profit such that distributions could be enjoyed by its shareholders.

~~84.~~87.  In 2017, Elyahou's divorce action was finally resolved~~, and Elyahou seemed recommitted to work~~.

**Elyahou ~~Expands~~Seeks To Expand AutoExpo and Sales Increase But Elyahou Says It Is Making No Money**

~~85.~~88.  Thereafter, Elyahou suggested to Shahkoohi that AutoExpo should expand operations by converting its then-service facility, located at 1800 Jericho Turnpike, New Hyde Park, New York, into a dealership.

89.    So, in accordance with Elyahou's suggestion, AutoExpo hired an architect to design and submit an application to the zoning authorities to convert that service facility to a dealership.

~~86.~~90.  Around this time, Elyahou suggested that AutoExpo try to bring in Defendant Eitan and his brother, Mr. Ronen Eitan ("Ronen") (Eitan and Ronen collectively the "Eitans"), as partners.

~~87.~~91.  The Eitans were already employed by AutoExpo as managers and had begun as employees of AutoExpo in or around May 2000, when AutoExpo first opened.

~~88.    The Eitans became employed by AutoExpo in or around May 2000, when AutoExpo first opened.~~

~~89.    So, AutoExpo hired an architect to design and submit an application to the zoning authorities to convert the service facility.~~

~~90.~~92.  In the midst of same, Elyahou advised that the Eitans decided that they did not want

to become partners in the business because they felt that they could earn more money working as employees.

91.93. In or about approximately 2018, Elyahou advised that AutoExpo was selling approximately 160 cars per month.

92.94. In approximately 2019, Elyahou suggested that AutoExpo further expand and suggested the purchase of property located at 400 Merrick Road, Valley Stream, New York 11580.

93.95. Elyahou suggested that AutoExpo was experiencing "record sales."

96. Shahkoohi was pleased to hear this but advised Elyahou that before we committedcommitting to any further expansion, Shahkoohihe wanted to look into the books and records to ensure the future profitability of the company, based on its business model. and.

94.97. Shahkoohi also told himElyahou that AutoExpo should be highly profitable given its "record sales."

95.98. Elyahou quickly about-faced and responded that "our expenses are high."

96.99. When Shahkoohi asked him for the records, rather than show him, Elyahou suggested that Shahkoohi "go to Fazeeda [Kassim]," AutoExpo's then- Controller, and "get them [him]self."

97.100.Shortly after these discussions, on March 10, 2020, Eitan suddenly resigned.

98.101.Then, Shahkoohi learned that Eitan incorporated Certified Performance, and Certified Performance was operating out of the very same property (400 Merrick Road in Valley Stream) that Elyahou had previously suggested AutoExpo purchase before Shahkoohi sought a review of AutoExpo's books and records.

**Elyahou's Schemes To Steal AutoExpo's Cash, Leads, and Customers**

  *a. Elyahou's "Double-Dipping" Scheme*

99.102.During 2018 and 2019, AutoExpo used a platform developed by a company, Tecobi, for its social media marketing.

100.103.      In or about 2021, Shahkoohi learned that Elyahou, in violation of the 2008 agreement, owned a company called "SimpSocial."

101.104.      When Elyahou was asked about SimpSocial by Shahkoohi and/or Robert, Elyahou advised that this entity was marketing in the "non-automotive market" which in no way affected AutoExpo.

102.105.      However, unbeknownst to Shahkoohi and Robert, sometime in 2019 or 2020, Elyahou had AutoExpo change its social media marketing platform from Tecobi to SimpSocial.

103.106.      Elyahou kept this secret from Shahkoohi and AutoExpo,

104.107.      Moreover, despite the fact that Elyahou was being paid to market AutoExpo, Shahkoohi learned that SimpSocial was charging AutoExpo approximately $10,000.00 per month for social media marketing.

105.108.      Upon information and belief, based on Shahkoohi's continuing investigation, Elyahou used AutoExpo's experience, resources, and staff to copy Tecobi's system (which, upon information and belief, was done using improper means), and after establishing SimpSocial, he started charging AutoExpo to perform the marketing tasks that Shahkoohi personally taught him.

109.   Because Elyahou was already responsible for, and being compensated for, marketing, charging AutoExpo, through SimpSocial, was completely improper and amounted to "double-dipping."

106.110.      In addition, the $10,000.00 per month fee that SimpSocial charged

AutoExpo, which was far greater than the amount that had been charged by Tecobi.

107.111.    To add insult to injury, Shahkoohi learned that SimpSocial was also charging other automobile dealerships $900.00 a month plus the cost of advertisements – plus $900.00 a month – 90% less than what it was charging AutoExpo.

112.    ThisIn other words, Elyahou was utterly fleecing AutoExpo.

108.113.    Elyahou's conduct was inappropriategross misconduct in violation of his contractual and fiduciary duties on several fronts.

109.114.    First, Elyahou lied to Shahkoohi that SimpSocial had nothing to do with automobile dealerships when it appears that its customers primarily consist of dealerships.

110.115.    Second, Elyahou charged AutoExpo substantially more for this unauthorized service that was previously performed in-house than all these other dealerships.

111.116.    Third, although AutoExpo was charged every month, AutoExpo had no proof that ads were actually being run.

**b.   *Elyahou's Outright Cash Stealing Scheme vis-à-vis Repo Companies***

112.117.    In, approximately, 2020, Shahkoohi spoke with one of AutoExpo's former employees, Daryoush Namigohar ("Namigohar"), whose duties included collecting monies due for storage of vehicles from repossession ("repo") companies picking up those vehicles from our facility.

113.118.    Namigohar confirmed that he had collected approximately $515,000 in cash from repo companies from approximately 2014.

114.119.    According to Namigohar, he gave all that cash to Elyahou, or AutoExpo's former Controller, Kassim.

115.120.    When Shahkoohi confronted Elyahou, he denied receiving cash from repo

companies, except for a few thousand dollars that he said was part of his cash withdrawals. Shahkoohi then questioned Kassim who denied having any records, and when Shahkoohi asked her if she had any bills, she claimed that they had been deleted.

116.121.      On September 27, 2023, Namigohar called Kassim who confirmed that she received monies collected by him from repossession companies, on ~~the~~ behalf of Auto Expo, and Kassim claimed that she, in turn, handed it to Elyahou.

117.122.      On the same day, Namigohar had telephone calls with Elyahou.

118.123.      Elyahou called Namigohar about five times after Namigohar's initial call.

119.124.      Elyahou advised Namigohar to lie and tell AutoExpo that he had not collected any such monies.

120.125.      Elyahou reiterated that Namigohar should not provide any information to AutoExpo, ~~stating~~making a nonsensical and despicable racist statement, "this is what black people do to black people," and threatened Namigohar by stating that if he provided any information to AutoExpo, he would be an "accomplice."

121.126.      Shahkoohi reviewed AutoExpo's computer files and bank account records for any cash deposits reflecting payments from the repo companies.

122.127.      Based on his investigation, that money never made it to AutoExpo's bank account.

123.128.      Upon information and belief, Elyahou and/or Kassim pocketed this cash from the repo companies for themselves – although this money belonged to AutoExpo.

124.129.      In addition, Elyahou and/or Kassim destroyed AutoExpo business records to "cover up" this theft of AutoExpo funds.

c.  *Elyahou Forms United Citizens, Which Aids AutoExpo's Competitors*

130.      Upon information and belief, on or about April 19, 2017, Elyahou formed United

[16]

Citizens.

131.   Upon information and belief, United Citizens was primarily in the business of selling warranty products.

132.   Upon information and belief, United Citizens sold warranty products to dealerships that competed with AutoExpo.

133.   To make matters worse, upon information and belief, beginning in or about September 2018, United Citizens entered into an agreement with MUSA Auto Finance LLC ("MUSA," now known as DRIVRZ Financial).

134.   MUSA engaged in the niche business of providing auto financing with respect to used vehicles.

135.   As a result of United Citizen's agreement with MUSA, United Citizens obtained commissions for signing up dealerships to enter into relationships with MUSA.

136.   Used car dealerships having a relationship with MUSA, or other companies that provide auto financing with respect to used vehicles have a competitive advantage over those dealerships that have no such relationship.

137.   By creating relationships between dealerships, other than AutoExpo, and MUSA, United Citizens, and Elyahou, as its sole owner, placed other dealerships on relative parity with AutoExpo in their ability to provide financing.

138.   Since AutoExpo was, at all relevant times, a used car dealership, United Citizens, and Elyahou, injured AutoExpo by creating these relationships.

### c.d. Elyahou's Lead Stealing and Business Diversion Scheme

125.139.   Elyahou engaged in a scheme to divert customers from AutoExpo's customer relationship management and leads generation system ("CRM Suite") and its

proprietary inventory system ("AutoExpo Inventory System") to Certified Performance, a direct competitor of AutoExpo, after Eitan left AutoExpo's employ, and to divert other AutoExpo employees to Certified Performance.

126.140.    Elyahou, through the AutoExpo's CRM Suite, had access to all AutoExpo leads.

127.141.    In 2020, after Eitan started Certified Performance, Shahkoohi noticed that Certified Performance was bidding against AutoExpo.

128.142.    Shahkoohi noticed this during the purchase process from MB On Demand.

129.143.    When Shahkoohi paid closer attention, it was apparent that Certified Performance was only bidding against AutoExpo on cars that Shahkoohi had previously disclosed to Elyahou, and Certified's Certified Performance's bids were only slightly higher than AutoExpo's.

130.144.    Also, Ivan Ivanenko ("Ivanenko"), AutoExpo's automobile buyer, was instructed by Elyahou to speak with him before making bids.

131.145.    Ivanenko would call Elyahou with his suggested bids, and in response, Elyahou would suggest not bidding or negotiating a lower price.

132.146.    After this occurred, Ivanenko typically would learn that the automobile he suggested purchasing had already been purchased by Certified Performance.

133.147.    This outbidding became a regular occurrence and substantially frustrated AutoExpo in its business operations.

134.148.    Meanwhile, in the summer of 2020, a car transporter asked Ivanenko: "Which dealership of Omid is he supposed to deliver the vehicles: AutoExpo or Certified?"

135.149.    Ivanenko reported this exchange to Shahkoohi.

136.150.      Similar incidents then occurred.

137.151.      Shahkoohi was advised by several people that Elyahou is partner with Eitan, and that they own Certified Performance together.

138.152.      After learning of this apparent betrayal and violation of the 2008 Agreement, Shahkoohi and his business partners set a meeting with Elyahou to confront him about it.

139.153.      Elyahou denied being partner with Eitan "in any shape or form."

140.154.      Shahkoohi discovered that Elyahou's protestations were all lies.

141.155.      It is very clear that Eitan and Elyahou have been in business with each other for years behind Shahkoohi's back, stealing directly from AutoExpo to its detriment for their benefit.

142.156.      By early 2023, it was clear that Elyahou's involvement with AutoExpo jeopardized its very existence.

143.157.      Among other things, the regular occurrence of being "outbid" by Certified Performance as to the very vehicles that Shahkoohi discussed bidding strategy with Elyahou, Eitan's doing business at the same location that Elyahou had, previously, suggested to AutoExpo (until Shahkoohi asked to "look at the books"), the confusion of a trucker asking where vehicles should be delivered (to AutoExpo or Certified Performance), the grossly improper personal expenses and credit card charges, and the stealing of monies collected from repo companies, all confirmed the extreme risk posed to AutoExpo by Elyahou's continued access to it.

144.158.      In addition, in early 2023, much of AutoExpo's sales staff began quitting and moving to Certified Performance.

145.159.      As a result, Shahkoohi started looking into the inventory and sales of

Certified Performance by reviewing its publicly available website.

146.160.    Although it operated with the same type of inventory and less vehicles, Shahkoohi learned from ex-employees of AutoExpo that Certified Performance was, nonetheless, considerably outselling AutoExpo every month.

147.161.    For example, in January 2023, AutoExpo sold thirty-three (33) vehicles, while, we estimate, Certified Performance sold one-hundred twenty-two (122) – four times the amount of AutoExpo.

148.162.    AutoExpo's purchase subjects and leads were being taken by Certified Performance.

149.163.    Upon information and belief, Elyahou was copying customer leads from AutoExpo's CRM Suite and forwarding them to Certified Performance.

150.164.    Moreover, Elyahou continued to have employees at AutoExpo who acted as "spies" to report to Elyahou what was going on since he was no longer around.

151.165.    By way of example, the Business Development Center ("BDC") manager at Auto Expo was Omid's sister-in-law, Angela Nektalov ("Nektalov").

152.166.    In addition, AutoExpo's manager, Ali Mahidashti, advised that Nektalov told him: "You are wasting this lead. ShahkoohiYou could have sold to Certified and gotten $1000.00."

153.167.    As of January 2023, Elyahou had not even appeared at AutoExpo for months.

154.168.    So, one day, on January 11, 2023, while Shahkoohi was there, Shahkoohi sat at Elyahou's desk and asked Sam Mahmud ("Mahmud"), AutoExpo's IT specialist, to create a username on the computer for Shahkoohi to work there.

155.169.      As if he had eyes in the store, Elyahou immediately called Robert and objected to Shahkoohi sitting at Elyahou's (actually, AutoExpo's) computer.

156.170.      The next day, on January 12, 2023, Elyahou directed Mahmud to have that computer removed from AutoExpo, apparently to delete the information contained thereon.

157.171.      Indeed, on that day, Shahkoohi came to the office around 1:00 p.m. and reviewed the security camera footage, which showed Mahmud removing the computer.

158.172.      Then, on February 20, 2023, AutoExpo's controller, Kassim resigned.

159.173.      A few days later, Nektalov sent the same kind of letter, stating: "~~Shahkoohi~~she can't accept working for the new management" and she "was loyal to [Elyahou]."

160.174.      In trying to understand Elyahou's motive for engaging in these schemes, the Plaintiffs' investigation soon made his intentions very clear.

161.175.      For months, while he was repeatedly lying to and stealing from Plaintiffs, Elyahou ~~has formed various corporate entities — SimpSocial and~~secretly was working with Certified Performance —in ~~order to begin his own group of dealerships to be operated~~competition with AutoExpo.


162.176.      Prior to Elyahou's working relationship with Plaintiffs, Elyahou had no familiarity with Shahkoohi's dealership processes and know-how, which Shahkoohi imparted to him as a business partner for the mutual success of AutoExpo.

163.177.      For example, Shahkoohi introduced Elyahou to a unique inventory system that was specifically customized for AutoExpo, which was a proprietary system.

164.178.      Shahkoohi also taught Elyahou the process of successfully operating an automobile dealership using such as processes to streamline dealership operations, inventory

management, cash flow management, and reporting features that identify areas of improvement.

~~165.~~179.    The information Shahkoohi imparted to Elyahou was therefore unique, confidential, and proprietary.

~~166.~~180.    Specifically, the inventory system Shahkoohi implemented at AutoExpo is unique because it was custom- designed for AutoExpo and cost over $170,000.00 to set up.

~~167.~~181.    It contained the blueprint for Shahkoohi's success at his dealerships because Shahkoohi knew how to use the customized features of the inventory system to operate dealerships profitably.

~~168.~~182.    During an investigation by Plaintiffs, Shahkoohi discovered that Elyahou sought to misappropriate this customized, unique, and proprietary blueprint for the purpose of setting it up at his own group of dealerships, e.g., for the benefit of Certified Performance.

~~169.~~183.    In other words, Elyahou stole the exact customization used by AutoExpo to use at his competing group of dealerships.

~~170.~~184.    In addition, in a blatant breach of his fiduciary duties to AutoExpo and Shahkoohi, Elyahou had AutoExpo employees work for his own group of dealerships *while they were employed by AutoExpo and were being paid to perform work only for AutoExpo!*

~~171.~~185.    Moreover, Elyahou illegally imparted the confidential know-how Shahkoohi imparted to him, as well as the proprietary information AutoExpo had in its possession, i.e., AutoExpo's customer lists with contact information of its customers, customized inventory system, and other sensitive information, to these employees for the purpose of setting up Elyahou's own group of dealerships at Certified Performance and, upon information and belief, elsewhere.

~~172.~~186.    To add insult to injury, Elyahou and the employees he poached misappropriated AutoExpo's customer list and used it to divert AutoExpo's customers to other

dealerships, including those in which Elyahou had an interest.

### ~~d.~~*e.**Elyahou's Scheme to Raid AutoExpo's Assets By Charging Personal Expenses And Taking Cash Advances At a Casino from Company Accounts and Other Bad Acts***

~~173.~~187.     Shahkoohi started to extensively review AutoExpo's expenses in 2021 and 2022.

~~174.~~188.     For example, at the end of 2021, Shahkoohi asked Kassim to see AutoExpo's payroll records.

~~175.~~189.     Kassim reluctantly provided Shahkoohi with access.

~~176.~~190.     When Shahkoohi reviewed ~~AutoExpo's employees'~~ the AutoExpo 401(k) ~~accounts~~ Profit Sharing Plan, *i.e.*, the Plan, he learned, for the first time, that the Company, without his knowledge or authority, was making a five- percent (5%) 401(k) match to employees.

191.     By taking an unauthorized company match of 5%, Elyahou violated the 2008 Agreement.

~~177.~~192.     Shahkoohi also learned that Elyahou had a balance of over $500,000.00 in his 401(k) account.

~~178.~~193.     Even if the five- percent (5%) match had been authorized, Elyahou's 401(k) balance was grossly inflated because it depended upon Elyahou's overdrawn compensation which was far greater than what had been agreed to.

~~179.~~194.     In addition, in 2021-22, Shahkoohi learned that Elyahou had an exorbitant amount and quantity of AutoExpo credit card charges that were wholly unrelated to the business.

~~180.~~195.     Shahkoohi noticed that Elyahou was charging many personal expenses on an AutoExpo's company credit card; when Shahkoohi asked Elyahou for details, he refused to provide them.

~~181.~~196.     To make matters worse, AutoExpo's ~~controller~~Controller, Kassim, would

not answer any questions from Shahkoohi without Elyahou's consent – even though she knew that Shahkoohi was ~~an~~the majority owner and was entitled to know all details about the company.

~~182.~~197.       Even when Shahkoohi would enter the dealership unannounced, Kassim would, upon information and belief, call or text Elyahou, and while Shahkoohi was there, Elyahou would interfere with Shahkoohi's inquiries of Kassim.

~~183.~~198.       Elyahou controlled the books and records without authority and refused to provide access to the books and records to Shahkoohi in derogation of his rights.

~~184.~~199.       Although Shahkoohi has asked Elyahou to return all AutoExpo's property, Elyahou refused to do so.

~~185.~~200.       Finally, when Elyahou responded to Shahkoohi's inquiries, Elyahou claimed that he considered those charges to be withdrawals (a crucial admission) and that they were "accounted for."

~~186.~~201.       However, when Shahkoohi reviewed his withdrawals, he found out that Elyahou had grossly overdrawn his $180,000.00 draw against his twenty- percent (20%) share.

~~187.~~202.       Shahkoohi also found many checks drawn on AutoExpo's account that were clearly for personal expenses; but were also unaccounted for.

~~188.~~203.       In addition, Shahkoohi discovered a Citibank credit card in AutoExpo's name, but Shahkoohi had not been aware of this account; when Shahkoohi confronted Elyahou about this credit card, Elyahou claimed that the card and his failure to account for it was an oversight.

~~189.~~204.       Shahkoohi also discovered that Elyahou received large cash advances at casinos – from AutoExpo's company credit card – that he withdrew, and for which he never reimbursed AutoExpo for these utterly improper withdrawals from the company credit card.

~~190.~~205.        Elyahou also claimed that AutoExpo was using Uber to pick up cars from places or drop off instead of sending a driver.

~~191.~~206.        However, when Shahkoohi looked into it, Shahkoohi found thousands of dollars of UberEats and Uber destination charges related to his own house and his ex-wife's house as well as his son's school.

~~192.~~207.        Similarly, Shahkoohi found Lyft charges for the same destinations.

~~193.~~208.        These expenses clearly had nothing to do with AutoExpo business.

~~194.~~209.        Shahkoohi also found out that cellular phones and cellular phone bills were paid for by the company – not only for Elyahou, but also for his wife (now ex-wife), his children and his mother.

~~195.~~210.        All of this was totally improper, and neither Shahkoohi nor the other partners ever agreed to these expenses.

~~196.~~211.        During 2021, Elyahou was going to AutoExpo approximately twice a week.

~~197.~~212.        Shahkoohi asked Elyahou for explanations as to the checks and charges for the years 2006 through 2013.

~~198.~~213.        In response, Omid said words to the effect of: "I don't have anything, and I didn't take anything," which was clearly belied by the evidence of these transactions.

~~199.~~        Every time Shahkoohi or his business partners asked a question, Elyahou would stall or would not provide a meaningful response.

~~200.~~214.        Based on Shahkoohi's (continuing) review of the AutoExpo records, and records evidencing the Elyahou's out theft of AutoExpo assets, it is clear that since 2006, Elyahou has embezzled over $5 million from AutoExpo.

201.215.    If Elyahou had taken the twenty percent (20%) share to which he was entitled, AutoExpo as a whole should have had profits during that time period in excess of $25 million.

202.216.    Instead, supposedly, AutoExpo's profits were only slightly over $5 million during the roughly 18-year period, meaning that Elyahou, essentially, stole the entirety of AutoExpo's assetsprofits – and, to add insult to injury, as set forth above – Elyahou has stolen AutoExpo's business model, absconded with its leads and proprietary inventory and customer information, and diverted AutoExpo's business.

203.217.    Prior to learning the full extent of his conduct, Shahkoohi began and continued to limit Elyahou's authority and responsibilities over the course of AutoExpo's continuing investigation into his conduct.

204.218.    For example, in January 2022, Shahkoohi directed Elyahou that he could not charge anything further on company credit cards.

205.219.    In June 2022, Shahkoohi directed Elyahou not to take any draws.

206.220.    In December 2022, Shahkoohi directed Elyahou that he was not authorized to take any company money at all for any purpose.

207.221.    From January through June 2022, Elyahou visited AutoExpo approximately once a week for a short period of time.

208.222.    After June 2022, Elyahou stopped coming to AutoExpo altogether and was not participating in any work.

223.    Elyahou thus neglected the business entirely, pushed all responsibilities to managers, and apparently pushed business to Certified Performance where he continues to unlawfully compete.

## Elyahou's Violation of ERISA With Kassim's Substantial Assistance

224.    In addition to the bad acts outlined above, before relinquishing control of day-to-operations at AutoExpo, Elyahou with the substantial assistance of Kassim, who was an improper "Plan Trustee," among other roles, engaged in bad acts in violation of ERISA and his fiduciary duties to AutoExpo and the Plan's participants – all of which must be reversed and corrected, with any damages and penalties assessed against Elyahou.

225.    Among the gross violations of ERISA and breaches of his fiduciary obligations, Elyahou, without authority, purported to have amendments made to the Plan, such as implementing a company match but without obtaining AutoExpo's approval, making other significant changes to Plan, such as changing the hardship withdrawal rules, failing to follow proper procedures in decision-making, making changes and taking steps for his own conflicted, self-interest, rather than for the interest of AutoExpo, the Plan and its participants.

226.    After significantly altering the Plan, without authority, over a number of years for the purpose of benefitting himself, Elyahou, including by adding benefits that would make participating employees, such as Kassim, more loyal to him, both he and Kassim orchestrated a scheme to establish a new Plan making Elyahou the sole Trustee, and in effect, giving Elyahou complete control over the plan without obtaining consent from AutoExpo.

227.    Upon information and belief, AutoExpo's Plan originally was created in 2006.

228.    The Plan is a Defined Contribution Plan within the meaning of Sections 3(35) of ERISA, 29 U.S.C. §§ 1002(35), and established and maintained for the purpose of providing retirement benefits to eligible participants and beneficiaries.

229.    At various times through the beginning of 2024, Elyahou is identified as sole "Trustee" or "Plan Administrator" of the new Plan.

230.   Upon information and belief, at various times through 2022, Kassim is identified as "Plan Administrator" or "Trustee/Authorized Signer" of the original Plan.

231.   The very first sentence of the Plan, purportedly amended on June 28, 2021, states at Section 1.1.1: "The Employer(s) whose signatures appear on the Adoption Agreement, hereby adopt a Plan to the known by the names set forth in the Adoption Agreement."

232.   Section 3.8.2 requires an "Employer resolution that adopts and sets forth [a Plan] amendment."

233.   On or about June 28, 2021, Elyahou signed the Plan's Defined Contribution Adoption Agreement, purportedly in his capacity as "President" of AutoExpo and as "Trustee" of the Plan.

234.   On July 6, 2021, Elyahou, supposedly in his capacity as "Secretary" of AutoExpo, signed a "Resolution of the Board of Directors of AutoExpo Ent. Inc.", but that resolution was a complete and utter sham as there was never any Board meeting as represented by Elyahou and there was never any resolution by Board as represented by Elyahou therein (hereinafter, the "Bogus July 2021 Resolution").

235.   The Bogus July 2021 Resolution falsely states, among other things:

Whereas, the Employer has the power to amend the Plan, on June 28, 2021, the following resolutions to amend the Auto Expo 401 (k) Plan (the Plan) was duly adopted by the Board of Directors of Auto Expo Ent. Inc., and that such resolutions have not been modified or rescinded as of the date hereof;

RESOLVED, that the form of Plan presented to the Board of Directors is a Cash or Deferred Profit Sharing Plan as authorized under Internal Revenue Code sections 401 (a), 401 (k), 402(9), 401 (m) and 501 (a). This restatement shall be effective January 1, 2021.

RESOLVED, that the form of the Plan presented to the Board of Directors is a restatement intended to meet the requirements as listed in IRS Notice 2017-37 as required in IRS Revenue Procedure 2016-37.

RESOLVED, that the Auto Expo 401(k) Plan (the Plan) presented to this meeting are hereby adopted and approved and that the proper officers of the Employer are hereby authorized and directed to execute and deliver to the Plan Administrator one or more counterparts of the Plan.

*        *        *

The undersigned further certifies that attached hereto as Exhibits A, B, C, D and E respectively are true copies of the Auto Expo 401 (k) Plan (the Plan) Summary Plan Description, Plan Expense Policy, Loan Policy and Life Insurance Policy approved and adopted in the above resolutions.

236.   Elyahou's representations "certif[ying]" Board approval and adoption of these the resolutions contained in the Bogus July 2021 Resolution are false.

237.   The AutoExpo Board never considered any amendment to the Plan, was never presented with any amendment to the Plan and certainly did not approve any amendments.

238.   In light of Elyahou's subsequent actions, it is clear that, among all the other calculating actions by Elyahou to exploit his position of trust as a shareholder, director and officer of AutoExpo, Elyahou was also planning by June 2021 to exploit his position as Trustee of the Plan.

239.   Among the unauthorized amendments to the Plan as a result of Elyahou's fraudulent and improper actions, the June 28, 2021, Defined Contribution Adoption Agreement purports to allow "hardship distributions" with "no limitations".

240.   Elyahou, without any authority, indicated on the June 28, 2021, Defined Contribution Adoption Agreement that the Plan would allow Non-Safe Hardship Distributions where "hardship will be defined as immediate and heavy financial need where the Participant lacks other available resources. The determination will be made by the Plan Administrator in a uniform and non-discriminatory manner."

241.   By way of example, during its investigation of these claims, AutoExpo learned that Elyahou, without regard for AutoExpo and the Plan participants, devised a tax evasion scheme

whereby he would use the Plan's Funds, improperly and in violation of ERISA, to purchase a new home, exposing AutoExpo to potential liability and, in any event, requiring AutoExpo to take corrective action.

242.   As part of his scheme, on or about April 1, 2022, Elyahou withdrew 100% of his funds contained in the Plan's John Hancock account (the "April 2022 Withdrawal").

243.   The April 2022 Withdrawal, among other things, fails to identify the reason for the withdrawal and directs John Hancock to send payment by wire to the Plan Trustee at AutoExpo's JP Morgan Chase 401(k) account.

244.   Upon information and belief, there was no supporting documentation submitted to, or considered by, the Plan Trustee, so that a reasoned determination could be made as to whether to allow the April 2022 Withdrawal as a "hardship withdrawal."

245.   No reason for the allowance of the April 2022 Withdrawal was provided.

246.   The John Hancock withdrawal form specifically states: "The Plan Trustee will be responsible for implementing the participant's direction and performing the applicable withholding and reporting obligations."

247.   On November 15, 2022, Elyahou used his authority as the Plan's Trustee to obtain a Cashier's Check from JP Morgan Chase, made payable to "June Mehrberg Rothstein LLC," in the amount of $521,000.00, utilizing funds from "AutoExpo Ent Inc/Auto Expo 401(k) Plan."

248.   During AutoExpo's investigation, AutoExpo discovered that "June Mehrberg Rothstein LLC" was the Seller of the $2,450,000.00 home in Great Neck, New York that Elyahou purchased on November 16, 2022 (the "House Payment").

249.   Elyahou was hopelessly conflicted in having the April 2022 Withdrawal effectuated and in utilizing funds from the Plan to purchase his house. For example, Elyahou was required to

make decisions in the best interests of the Plan, but he allowed the April 2022 Withdrawal solely because it benefitted him.

250.    If someone, other than himself, had asked for a $500,000 withdrawal from the Plan, he probably would have rejected it.

251.    In any event, authorizing such a withdrawal without making a reasoned determination and without proper reporting was in gross violation of Elyahou's fiduciary obligations and obligations under ERISA.

252.    Upon information and belief, Elyahou, as Trustee, failed to perform the applicable withholding and reporting obligations in connection with the April 2022 Withdrawal and/or the House Payment in violation of his obligations under ERISA.

253.    Upon information and belief, Elyahou failed to perform these obligations in an attempt to evade liability for taxes and penalties.

254.    Upon information and belief, there were no loan or withdrawal documents filed with the plan's administrator authorizing this withdrawal.

255.    Upon review of the Plan's "participant loan" provisions and the applicable IRS laws, the amount that Elyahou withdrew from the Plan's funds far exceeded the $50,000 maximum loan amount a participant may borrow.

256.    It is clear that Elyahou's actions were designed to evade IRS reporting requirements which would have subjected Elyahou to ordinary income tax and violated 26 USCS § 3405 (b) (1) by not withholding 10% of the distributed funds.

257.    Although the June 28, 2021, amendments were ultra vires actions, even if those amendments had been valid, Elyahou, as the Plan Administrator, was obligated to make reasonable determinations "in a uniform and non-discriminatory manner."

258.   There is no record of any assessment or judgment, of any kind, by Elyahou or Kassim is, purportedly, authorizing the April 2022 Withdrawal and/or the House Payment in violation of their obligations under ERISA.

259.   The April 2022 Withdrawal and/or House Payment violated the 2008 Agreement.

260.   Elyahou's and Kassim's improper actions and Elyahou's malicious conduct which clearly was an abuse of his power and in breach his fiduciary duty expose AutoExpo and its shareholders to significant tax liability as well as unforeseeable repercussions as a result of ERISA violations, and in any event, requires substantial corrective action, which AutoExpo must take in consultation with professionals and perhaps the Secretary of Labor[2] to undo the damage Elyahou has caused not just to AutoExpo, but to all of the Plans participants. .

**Kassim's Substantial Assistance**

261.   The foregoing was substantially assisted by Kassim.

262.   Upon information and belief, Kassim, without the authorization of AutoExpo, was established the original Plan's Trustee and therefore the gatekeeper to the Plan's funds. To execute Elyahou's tax evasion scheme, Elyahou needed Kassim to release the Plan's funds into a new Plan where Elyahou was the sole Trustee.

263.   In order to do so, Kassim signed a withdrawal authorization as "Trustee/Authorized Signer" certifying that "it is my responsibility to ensure that the withdrawal(s) requested herein are permitted by law and, if applicable, consistent with the terms of the Plan…and that the funds being withdrawn are not for the purpose of prohibited transactions as defined in IRC Sec. 4975."

264.   Upon information and belief, Kassim knowingly and willingly signed this

_____

[2] Elyahou, himself, may have liability under, *inter alia*, 29 U.S.C. §§ 1109(a) and 1132.

withdrawal authorization in direct violation of the Plan's Agreement with the specific intent to allow Elyahou to engage in prohibited transactions and misconduct.

265.     Kassim aided and abetted Elyahou's actions and is also culpable.

266.     By reason of the foregoing, both Kassim and Elyahou should be held jointly and severally liable for the damages they caused to AutoExpo by violating both the terms of the Plan's Agreement as well as ERISA laws.

**Elyahou Relinquishes Management And Continues To Harm AutoExpo To This Day**

~~210.~~267.     In March 2023, Shahkoohi asked Elyahou to sign new bylaws and to agree that Shahkoohi would manage AutoExpo going forward.

~~211.~~268.     Elyahou agreed to and executed the new bylaws on or about March 30, 2023.

~~212.~~269.     By this time, Elyahou, Eitan, and Kassim had already poached several AutoExpo employees who had begun working for Certified Performance.

~~213.~~270.     Since then, AutoExpo has discovered, among other things, that Elyahou had deleted data from three (3) hard drives.

~~214.~~271.     It is clear that Elyahou, while he technically remains a twenty percent (20%) shareholder of AutoExpo at this time, has engaged, and continues to engage, in egregious misconduct directly adverse to the interest of AutoExpo.

~~215.~~272.     Elyahou remains in possession of AutoExpo's property, including its books and records and registered Internet domain names, which he has refused to turn over, despite AutoExpo's due demand.

~~216.~~273.     By reason of the foregoing, and as further set forth below, Elyahou is liable to AutoExpo for violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, and for

cyberpiracy, pursuant to 15 U.S.C. § 1125(d).

**Eitan/Certified** Performance **and Kassim Join Elyahou's Schemes or Substantially Assist Elyahou**

217.274.    Defendants Eitan and Kassim each directly participated in, and/or substantially assisted Elyahou in, carrying out his unlawful schemes.

*Kassim's Participation, and/or Aiding and Substantial Assistance to Elyahou*

218.275.    Upon information and belief, based on the facts as set forth above, Kassim was well-aware of Elyahou's theft, raiding of corporate assets, and his diversion of business.

219.276.    Upon information and belief, at all relevant times until February 2023, Kassim was employed by AutoExpo as its Controller, and held a duty of loyalty and fidelity to AutoExpo as an employee in whom great trust was placed.

220.277.    Kassim, thus, managed and controlled the AutoExpo's book and records.

221.278.    Upon information and belief, at all relevant times until February 2023, Kassim was aware of Elyahou's role, including the fact that he was compensated by AutoExpo.

222.279.    Upon information and belief, at all relevant times until February 2023, Kassim was aware that Elyahou's duties included handling day-to-day operations of AutoExpo, such as overseeing sales and marketing.

223.280.    Upon information and belief, Kassim was aware that Elyahou owned SimpSocial.

224.281.    As Controller, it was Kassim's duty to provide sales and expense analysis for all departments.

225.282.    As Controller, it was Kassim's job to fairly represent the financial condition of the dealership, to develop controls necessary for the proper conduct of the business, and to maintain accurate records.

226.283.          As Controller, it was Kassim's job to advise AutoExpo's owners, including Shahkoohi, if there were improper expenses charged to the company.

227.284.          As Controller, Kassim was, upon information and belief, aware that AutoExpo, through Elyahou, terminated the marketing services that had been provided by Tecobi.

228.285.          As Controller, Kassim was, upon information and belief, aware that AutoExpo, through Elyahou, hired SimpSocial to provide marketing services.

229.286.          Upon information and belief, Kassim was aware of the charges to AutoExpo from SimpSocial.

230.287.          Upon information and belief, Kassim knew or should have known that those charges were improper, bit Kassim did nothing to advise Shahkoohi, Robert, or anyone at AutoExpo of Elyahou's wrongdoing.

231.288.          Kassim substantially assisted or aided the payment to SimpSocial.

289.     Kassim also colluded with Elyahou to orchestrate a tax evasion scheme in direct violation with ERISA law.

232.290.          Upon information and belief, Kassim was aware that AutoExpo received cash payments from various repo companies for the repossession of vehicles in AutoExpo's possession.

233.291.          Upon information and belief, between January 1, 2014 and February 2023, Kassim received at least $500,000 in cash, directly from repo companies, or from AutoExpo employees, such as Namigohar, who received the money from repo companies.

234.292.          On several occasions, when Shahkoohi asked Kassim for records concerning receipts or proving receipt of funds by AutoExpo, Kassim claimed that she had no records or that records were no longer available.

235.293.      Upon information and belief, Kassim either pocketed the cash herself or gave the cash to Elyahou.

236.294.      Upon information and belief, Kassim intentionally destroyed AutoExpo's business records to cover up her wrongdoing, or alternatively, to aid and assist Elyahou's scheme.

237.295.      Upon information and belief, Kassim was well-aware that Elyahou was utilizing AutoExpo's confidential and proprietary information, diverting business leads and directing diverting business to AutoExpo's competitors, including Certified Performance.

238.296.      Upon information and belief, based on the facts as set forth above, although Kassim was employed by AutoExpo, she never advised Shahkoohi or anyone at AutoExpo of Elyahou's wrongdoing; in fact, right up until her resignation, it is clear that Kassim, although her duties ran to AutoExpo, was loyal to Elyahou.

239.297.      By way of example, in her resignation letter, Kassim, among other things, professed that Elyahou was her "friend" and "confidant," that she "will always be indebted to" Elyahou, that she "will always be agent for Omid."

*Eitan's and ~~Certified's~~Certified Performance's Participation in Elyahou's Diversion Scheme*

240.298.      Eitan and Certified Performance clearly participated and joined in Elyahou's scheme to divert trade secrets and business from AutoExpo to Certified Performance.

241.299.      As a former manager of AutoExpo, Eitan knew AutoExpo's business.

242.300.      Eitan knew how AutoExpo relied upon its CRM Suite and its proprietary inventory system, AutoExpo Inventory System, to generate leads and sell to customers.

243.301.      Eitan also knew that Elyahou utilized SimpSocial and had access to AutoExpo's marketing information.

244.302.      Upon information and belief, Eitan and Elyahou entered into a secret

agreement, whereby they would form a business together and Elyahou would divert AutoExpo's customers to Eitan's business.

245.303.    As set forth above, once Eitan resigned AutoExpo in March 2020, he incorporated Certified Performance.

246.304.    Certified Performance operated out of the very location that Elyahou researched while employed by AutoExpo and suggested for AutoExpo to purchase and expand its operations.

247.305.    Upon information and belief, Eitan was well-aware of Elyahou's access to AutoExpo's confidential and proprietary business information.

248.306.    Eitan knew or should have known that Certified'sCertified Performance's business was created only by directly stealing AutoExpo's business.

249.307.    Defendants' conduct constitutes a violation of the DTSA, and related state law common claims for misappropriation of trade secrets and unfair competition, as well as, among other things, a breach of Elyahou's fiduciary duty to Shahkoohi.

250.308.    Defendants Kassim, Eitan and Elyahou acted together in setting up CompetitionCertified Performance as a competing dealership built with the stolen trade secrets and confidential information of AutoExpo.

251.309.    Defendants are currently benefitting from the confidential information Shahkoohi developed and sourced over thirty years in the automobile dealership industry, and since 2020, when Certified Performance was incorporated.

252.310.    This information includes AutoExpo's customer lists, including its leads and AutoExpo's customized inventory system, as well as other proprietary information.

253.311.     AutoExpo's business model, its customer lists, information related to its revenues and profit margins, and the related information Elyahou, Eitan, and Kassim obtained during their employment with AutoExpo are confidential and proprietary, and took great costs and efforts to create, including Shahkoohi's decades of experience in the automobile industry, and the unique know-how he has in how to successfully operate automobile dealerships.

254.312.     Shahkoohi went through painstaking efforts, time, and money to build the group of dealerships he owns to what it is today.

255.313.     AutoExpo and Shahkoohi have spent the last three decades marketing AutoExpo, developing its brand, and cultivating relationships with AutoExpo's customers and contacts in the automobile industry, many of whom worked with Shahkoohi for decades.

256.314.     Elyahou only learned of AutoExpo's know-how and trade secrets through his fiduciary relationship with Shahkoohi, for the sole purpose of maximizing AutoExpo's success.

257.315.     Defendants have sought to exploit this information through improper means.

258.316.     Defendants have done so by working together to pillage and plunder AutoExpo.

259.317.     Alternatively, Defendants Certified Performance, Eitan, and Kassim have aided and substantially assisted Elyahou in carrying out his fraudulent schemes.

260.318.     AutoExpo's trade secrets, including but not limited to its customer lists, employees, processes, and unique inventory system are vital to its business; possession of that information, which Defendants, as set forth herein, misappropriated in contravention of their fiduciary duty to Plaintiff and in violation of the law, provided Plaintiff a unique competitive advantage in the dealership industry, a competitive advantage it has been stripped of by

Defendants' unlawful acts.

~~261.~~319.   AutoExpo took many reasonable measures to keep its confidential information secret, including restricting access to this information only to employees who have a fiduciary duty to AutoExpo, all of whom are required to maintain it in a secured computer system protected by firewalls and other appropriate safeguards, such as usernames and passwords.

~~262.~~320.   ~~The confidential~~Confidential information derives independent economic value from not being generally known to and not being readily ascertainable through proper means from others who could otherwise obtain economic value from the disclosure or use of the information.

~~263.~~321.   This confidential information is related to services used in and intended for use in interstate or foreign commerce because AutoExpo sells vehicles in New York, among others, including New Jersey, Connecticut, and many other States, in the regular course of its business.

~~264.~~322.   Elyahou, Certified Performance, Eitan and Kassim knew and had reason to know that the trade secrets and confidential information they obtained – including customer lists, financial information, details about customers, and AutoExpo's proprietary inventory system – were acquired by improper means.

~~265.~~323.   This is evidenced by their bad faith conduct in plundering, pillaging, and massacring the goodwill and value of AutoExpo.

~~266.~~324.   The unauthorized acts of Defendants in using critical confidential information to cut AutoExpo out of its business in order to build a competing dealership is unlawful.

~~267.~~325.   There was no other way to obtain this information and Elyahou, Certified

Performance and Eitan used it as a "roadmap" and "step by step manual" to establish their own operations to the exclusion of AutoExpo and Shahkoohi to whom they owed fiduciary duties.

268.326.    For example, Elyahou, Certified Performance, and Eitan did not need to expend time, effort, and money in building a customized inventory system: they simply stole it from AutoExpo and Shahkoohi.

269.327.    Similarly, Elyahou, Certified Performance and Eitan did not need to search for customers: they simply diverted them from AutoExpo to Certified Performance.

270.328.    Moreover, Elyahou, Certified Performance and Eitan did not need to hire and pay employees: they simply had AutoExpo's employees work for the benefit of Certified Performance while being paid by AutoExpo.

271.329.    AutoExpo's trade secrets and confidential information that Elyahou, Certified Performance, and Eitan misappropriated through gaining the trust of Shahkoohi by and through Elyahou's fiduciary relationship as a minority shareholder of AutoExpo provided them with the ability to duplicate operational, service, and development techniques that Shahkoohi has spent years, if not decades, establishing.

272.330.    Meanwhile, Elyahou, Certified Performance and Eitan through subterfuge gained access to information that they would have no other way of obtaining.

273.331.    Elyahou, Certified Performance and Eitan misappropriated confidential and trade secret information by improper means; no permission was given to them to utilize AutoExpo's customer lists, customer information, proprietary inventory system, financial information, and details about its customers for any purpose except for the benefit of AutoExpo.

274.332.    It is obvious from the brazen tactics of Elyahou, Certified Performance, and

Eitan's that they are actively engaged in a scheme to plunder and to destroy AutoExpo – a company Shahkoohi spent decades building.

275.333.    Upon information and belief, a significant number of AutoExpo's customers and leads have been solicited by Elyahou, Certified Performance and Eitan using AutoExpo's trade secrets and confidential information.

276.334.    Immediate injunctive relief and a permanent injunction is necessary to prevent Elyahou, Certified Performance, and Eitan from destroying the customer relationships, brand, and goodwill that Shahkoohi and AutoExpo have spent years building, from profiting on a business that they stole from AutoExpo, and causing further imminent and irreparable financial harm to AutoExpo.

277.335.    In addition to other remedies, Defendant CompetitionCertified Performance should be directed to return the misappropriated information and enjoined from engaging in any further unlawful conduct, it is essential that AutoExpo also be permitted forensically to examine Elyahou's, Certified'sCertified Performance's, Eitan's and Kassim's email accounts, computers, cellular phones, and any other electronic devices or cloud storage accounts, to determine the exact nature and extent of their unlawful scheme to steal AutoExpo's business.

**AS AND FOR THEIR FIRST CAUSE OF ACTION**
**(Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. §1836 – All Defendants)**

278.336.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

279.337.    The Defendants' actions, as set forth herein, constitute misappropriation under the DTSA, 18 U.S.C. § 1836, in that they possess trade secrets and confidential information belonging to Plaintiff, including the identity of all of its customers, contact information, financial information, and AutoExpo's customized inventory system information.

280.338. Plaintiffs havePlaintiff, AutoExpo, has made and makemakes reasonable efforts to maintain the secrecy of this information, including limiting its disclosure to those who owe a fiduciary duty to the dealerships, *i.e.*, Defendants had no authority to utilize confidential information and trade secrets of AutoExpo.

281.339.    The confidential information and trade secrets belonging to AutoExpo that Defendants possess derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through, proper means by another person who can obtain economic value from the disclosure or use of the information.

282.340.    Indeed, Defendants utilized this very information as a road map to open a competing group of dealerships and to unfairly compete against AutoExpo in dastardly fashion.

283.341.    Defendants knew that this information contained confidential information and trade secrets belonging to AutoExpo.

284.342.    Defendants have no right to retain or to use any of AutoExpo's trade secrets or other confidential and proprietary information due to their illegal conduct.

285.343.    Upon information and belief, Defendants are retaining and using AutoExpo's confidential information and trade secrets to compete with AutoExpo; AutoExpo did not consent to Defendants' use of the information as set forth above.

286.344.    At all relevant times, Defendants knew that the information obtained by them contained AutoExpo's proprietary trade secrets that they had no right to receive and could not receive absent their improper acts.

287.345.    Defendants' conduct thus constitutes knowing, willful, and malicious misappropriation.

288.346.    Defendants have used AutoExpo's confidential information and trade

secrets to sell vehicles, through interstate commerce, and to compete with Plaintiffs, causing substantial loss of sales to them and damage to its relationships with its clients and the potential obliteration of the Plaintiffs' dealerships.

~~289.~~347.     Defendants have wrongfully acquired and used AutoExpo's confidential information and trade secrets and continue to do so, without the express or implied consent of AutoExpo, for Defendants' own benefit and the benefit of others.

~~290.~~348.     The public policy in favor of protecting AutoExpo's interest in maintaining its trade secrets outweighs any interest Defendants could have in using AutoExpo's confidential information and trade secrets.

~~291.~~349.     As a direct and proximate result of Defendants' misappropriation of AutoExpo's confidential information and trade secrets, AutoExpo has suffered and continues to suffer immediate and irreparable injury, loss, harm, or damage, including, without limitation, the loss of its brand recognition and goodwill with its clients, and will continue to suffer said injury, loss, harm, or damage unless and until Defendants are restrained from their continued misappropriation of confidential information and trade secrets.

### AS AND FOR THEIR SECOND CAUSE OF ACTION
**Injunctive Relief under the DTSA (18 U.S.C. § 1836, *et seq.* – All Defendants) and under ERISA: 502(a)(3) – Elyahou and Kassim**

~~292.~~350.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

~~293.~~351.     AutoExpo operates its business in interstate commerce in New York, New Jersey, Connecticut, and other states, by selling vehicles to customers in those states.

~~294.~~352.     The trade secrets misappropriated by Defendants are related to, and intended for use in, interstate commerce.

295.353.      As set forth above, Defendants improperly acquired AutoExpo's trade secrets, including information regarding its business, operations, services, customers, pricing, sales, and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone except those with a fiduciary duty who were obligated to keep this information confidential.

296.354.      The aforementioned information qualifies as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).

297.355.      The misappropriated documents concern AutoExpo's operations, services, customers, pricing, sales, and marketing strategies, including financial, business, and economic information, plans, methods, techniques, procedures, formulas, and processes.

298.356.      Further, AutoExpo has taken reasonable measures to keep such information secret by, *inter alia*, limiting highly sensitive information to those who have a fiduciary duty to it.

299.357.      The trade secrets misappropriated by Defendants include those which required substantial resources, time, and investment by AutoExpo to create and/or develop, and thus derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information.

300.358.      Defendants' misappropriation of AutoExpo's trade secrets has caused AutoExpo to suffer harm, including, but not limited to, the loss of clients, loss of reputation, damage to their brand, and customer goodwill, and loss of the confidentiality of, and investment in, its trade secrets.

301.359.      This harm cannot be adequately remedied atby law and requires injunctive relief.

302.360.	AutoExpo will suffer irreparable and imminent harm in the absence of relief.

303.361.	Defendants' continued misappropriation of AutoExpo's trade secrets and failure to return AutoExpo's documents containing trade secrets, including AutoExpo's customer information, will cause AutoExpo further loss of clients, customers, accounts and/or market share.

304.362.	This imminent injury is neither remote nor speculative, because AutoExpo has already been harmed in precisely this manner by Defendants' misappropriation and use thereof and will continue to be irreparably harmed in the absence of a permanent injunction.

305.363.	Defendants will not suffer harm from the rightful return of Plaintiffs'Plaintiff, AutoExpo's. proprietary information and trade secrets and will not be prevented from conducting their ordinary business by lawful means; Defendants will merely be prevented from continuing to gain an unfair and unlawful advantage at Plaintiffs'Plaintiff, AutoExpo's, expense.

306.364.	The ongoing, continuing, and future harm to Plaintiffs'Plaintiff, AutoExpo, cannot be adequately remedied at law and requires permanent injunctive relief;.

307.365.	The public interest would not be disserved by the issuance of an injunction preventing Defendants from misappropriating Plaintiffs'Plaintiff, AutoExpo's, trade secrets.

308.366.	Accordingly, PlaintiffsPlaintiff, AutoExpo, are entitled to an injunction, pursuant to 18 U.S.C. § 1836(b)(3)(A), enjoining Defendants from continuing to use AutoExpo Plaintiff'sPlaintiff, AutoExpo's, trade secrets, in order to prevent continued actual and threatened misappropriation of Plaintiffs'Plaintiff, AutoExpo's, trade secrets and requiring Defendants to return and/or destroy the trade secrets improperly accessed and retained by Elyahou Defendants, pursuant to 18 U.S.C. § 1836(b)(3)(A)(ii).

367.    In addition, Plaintiff, AutoExpo, are entitled to an injunction under ERISA: 502(a)(3) seeking to enjoin the Defendants to any order or decree issued by the Secretary of Labor to restore the Plaintiff's 401(k) to its former position and satisfy any penalties the Secretary of Labor deems just and proper.

### AS AND FOR THEIR THIRD CAUSE OF ACTION
**(Misappropriation – All Defendants)**

309.368.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

310.369.    Defendants' actions, as set forth herein, constitute misappropriation under New York law.

311.370.    Defendants currently possess information belonging to and used in the operation of Plaintiffs' businesses, which information constitutes confidential, proprietary, and trade secret information under New York law.

312.371.    Such information was developed by Plaintiffs through great effort and expense, in terms of manpower, time, and costs, and is extremely valuable to Plaintiffs, as it is crucial to the operation of its business, cannot easily be acquired or duplicated by others, and, if made available to others, would enable competition with Plaintiffs to their detriment.

313.372.    Plaintiffs make reasonable efforts to maintain the secrecy of this information, including limiting its disclosure to those who have a fiduciary duty to them.

314.373.    Upon information and belief, Defendants knowingly and improperly obtained and used such trade secrets and confidential information for their own benefit.

315.374.    The improperly retained information constitute trade secrets and Defendants' actions pose a real and actualized risk that they will and have misappropriated these secrets by using the information to their advantage or for their own personal economic gain and

with the willful and malicious intent to injure Plaintiffs' business and their brand.

316.375.    As a result, Plaintiffs have suffered direct and consequential damages and are entitled to recover compensatory damages, including opportunity costs and punitive damages in an amount to be proven at trial.

### AS AND FOR THEIR FOURTH CAUSE OF ACTION
### (Unfair Competition – All Defendants)

317.376.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

318.377.    Through Defendants' misappropriation of Plaintiffs' confidential trade secrets, Defendants have stolen customers and poached employees and employed them while they were solely being paid by AutoExpo to work solely for AutoExpo to serve their own dealerships.

319.378.    As a result of Defendants' use of the trade secrets they misappropriated to obtain a competitive advantage against Plaintiffs, Defendants have caused economic damages to Plaintiffs along with diminishing their goodwill.

### AS AND FOR THEIR FIFTH CAUSE OF ACTION
### (Tortious Interference with Contracts, business relations, and prospective economic advantage – All Defendants)

320.379.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

321.380.    Plaintiffs have entered into valid written agreements with their vendors, customers, and employees concerning their businesses.

322.381.    Defendants were at all relevant times aware of these agreements between Plaintiffs and their banks, vendors, customers, and employees.

323.382.    Defendants engaged in conduct designed to damage those relationships.

324.383.    For example, Defendants diverted customers away from Plaintiffs to other

dealerships owned or operated by them, i.e., Certified Performance.

325.384.    As yet another example, Defendants poached employees away from Plaintiffs to other dealerships owned or operated by Defendants, some of which were poached while those employees remained on Plaintiffs' payroll, such that Defendants interfered with Plaintiffs' employment relationship with their employees.

326.385.    As a consequence of Elyahou Defendants' acts to sabotage Plaintiffs' relationships with vendors, customers, and employees of Plaintiffs for their benefit, they have been injured.

327.386.    Plaintiffs are therefore entitled to recover damages including but not limited to financial loss, loss of goodwill and reputation, compensatory and special damages, interest, and punitive damages in an amount to be proven at trial, and Defendants' conduct was intentional, willful, and malicious, thus justifying the award of punitive damages and/or exemplary damages.

## AS AND FOR THEIR SIXTH CAUSE OF ACTION
### (Conversion – All Defendants)

328.387.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

329.388.    Plaintiffs have a possessory right and legal ownership to their vehicles, confidential information, and trade secrets referenced herein.

330.389.    Defendants exercised unauthorized dominion over Plaintiffs' vehicles, confidential information, and trade secrets.

331.390.    Defendants willfully exercised unauthorized dominion over Plaintiffs' vehicles, confidential information, and trade secrets to the detriment of Plaintiffs.

332.391.    Defendants' unauthorized dominion over Plaintiffs' vehicles, confidential information, and trade secrets was and is to their exclusion of Plaintiffs' rights.

333.392.      Defendants' unauthorized dominion over Plaintiffs' vehicles, confidential information, and trade secrets constitutes conversion.

334.393.      Elyahou Defendants have thus committed the tort of conversion under New York common law.

## AS AND FOR THEIR SEVENTH CAUSE OF ACTION
### (Civil Conspiracy – All Defendants)

335.394.      Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

336.395.      Defendants conspired with each other for an unlawful purpose, to wit: to obtain Plaintiffs' confidential information and to develop a business to compete with AutoExpo using Plaintiffs' confidential information and property obtained through fraud.

337.396.      Defendants have entered into a civil conspiracy to engage in, *inter alia*, misappropriation, unfair competition, unjust enrichment, and tortious interference with contract.

338.397.      Defendants each agreed to this common goal and acted in concert with the specific object of harming Plaintiffs for their own personal gain.

339.398.      Each Defendant performed an overt act in furtherance of the conspiracy.

340.399.      The unlawful alleged herein, including acts directed into the State of New York, were committed in furtherance of that conspiracy.

341.400.      As a result of the Defendants' combined, concerted, and continuing efforts, Plaintiffs were, are, and continue to be damaged.

342.401.      As a consequence of Defendants' acts to steal from Plaintiffs, they have been injured, for which they are entitled to recover damages including but not limited to financial loss, loss of goodwill and reputation, compensatory and special damages, interest, and punitive damages, in an amount to be determined at trial, directly caused by Defendants' misconduct.

**<u>AS AND FOR THEIR EIGHTH CAUSE OF ACTION</u>** ~~ON BEHALF OF PLAINTIFFS AND OTHER SHAREHOLDERS OR MEMBERS OF PLAINTIFFS' SIMILARLY SITUATED~~
**(Declaratory Judgment – Against Elyahou)**

~~142.~~402.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~143.~~403.    Shahkoohi is the majority member or shareholder of the Plaintiffs.

~~144.~~404.    Elyahou has acted as if he is the sole member or shareholder of the Plaintiffs.

~~145.~~405.    Determination of the ownership of the Plaintiffs is necessary to resolve the rights and obligations of each of the parties to each other.

~~146.~~406.    There exists a justiciable controversy which is ripe for judgment.

~~147.~~407.    Plaintiffs seeks a declaratory judgment declaring that Shahkoohi is the sole member or shareholder of the Plaintiffs.

~~148.~~408.    Plaintiffs have no adequate remedy at law.

**<u>AS AND FOR THEIR NINTH CAUSE OF ACTION</u>**
~~DERIVATIVELY ON BEHALF OF PLAINTIFFS~~
**(Conversion-Against Elyahou)**

~~149.~~409.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~150.~~410.    Plaintiffs are the rightful owner of, and have superior rights to, the assets alleged herein.

~~151.~~411.    Elyahou has exercised unauthorized dominion or control over the assets of the Plaintiffs.

~~152.~~412.    By managing the day-to-day operations of the Plaintiffs, Elyahou was under

an obligation to maintain and/or use the assets for the benefit of Plaintiffs and was not permitted to use the assets for his own personal benefit.

153.413.     Despite due demand, Elyahou has refused to return to Plaintiffs the assets converted.

154.414.     Elyahou has wrongfully converted the foregoing assets for his own, personal use, thereby damaging Plaintiffs.

155.415.     By reason of the foregoing, Plaintiffs demand judgment against Elyahou in an amount to be determined by the Court.

## AS AND FOR THEIR TENTH CAUSE OF ACTION
~~DERIVATIVELY ON BEHALF OF PLAINTIFFS~~
### (Unjust Enrichment-Against Elyahou)

156.416.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

157.417.     Elyahou's retention of the assets of Plaintiffs has caused him to be unjustly enriched at Plaintiffs' expense.

158.418.     The circumstances of Elyahou's enrichment are such that equity and good conscience require Elyahou to make restitution.

159.419.     By reason of the foregoing, Plaintiffs demand judgment against Elyahou for a sum of $10,000,000.00.

## AS AND FOR THEIR ELEVENTH CAUSE OF ACTION
~~DERIVATIVELY ON BEHALF OF AUTOEXPO~~
### (Breach of Duty of Loyalty-Against Elyahou)

160.420.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

161.421.     As an employee and the ~~general manager of Plaintiffs~~Operating Partner of

Plaintiff AutoExpo, Elyahou owed duties of loyalty and good faith to Plaintiffs.

162.422.     As set forth in detail above, Elyahou has breached such duties.

163.423.     By virtue of the foregoing, NorthshoreAutoExpo has been damaged in the amount of $10,000,000.00.

## AS AND FOR THEIR TWELFTH CAUSE OF ACTION
## ~~DERIVATIVELY ON BEHALF OF AUTOEXPO~~
### (Breach of Fiduciary Duty-Against Elyahou)

164.424.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

165.425.     As an employee and the general managerOperating Partner of the PlaintiffsPlaintiff AutoExpo, Elyahou had a fiduciary duty to act in the best interest of PlaintiffsPlaintiffAutoExpo.

166.426.     As set forth in detail above, Elyahou has breached such duty.

167.427.     By virtue of the foregoing, NorthshoreAutoExpo has been damaged in the amount of $10,000,000.00.

## AS AND FOR THEIR THIRTEENTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty-Against All Defendants Except Elyahou)

428.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

429.     By reason of the foregoing, SimpSocial, United Citizens, Certified Performance, Eitan, and Kassim have, individually and collectively, substantially assisted Elyahou's breaches of fiduciary duty to AutoExpo.

430.     At all relevant times, SimpSocial, United Citizens, Certified Performance, Eitan, and Kassim had actual knowledge that Elyahou was an owner and Operating Partner of AutoExpo and, as such, owed fiduciary duties to AutoExpo.

431.     At all relevant times, SimpSocial, United Citizens, Certified Performance, Eitan, and Kassim knew that any improper diversion of business, business opportunities or aid to competitors of AutoExpo would deplete the value of AutoExpo and reduce the profits available to AutoExpo to be distributed to its owners.

432.     At all relevant times, SimpSocial, United Citizens, Certified Performance, Eitan, and Kassim had actual knowledge that Elyahou's wrongful actions have operated to the detriment of AUtoExpo and represent breaches of his fiduciary duties to AutoExpo.

433.     By reason of SimpSocial, United Citizens, Certified Performance, Eitan, and Kassim's aiding and abetting Alyahou's breaches of fiduciary duty to AutoExpo, AutoExpo has been damaged in an amount to be determined at trial, but believed to exceed the amount of $10,000,000.00.

### AS AND FOR THEIR FOURTEENTH CAUSE OF ACTION
~~DERIVATIVELY AND THOSE SHAREHOLDERS OR MEMBERS OF PLAINTIFFS SIMILARLY SITUATED~~
**(Permanent Injunction-Against Elyahou)**

~~168.~~434.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~169.~~435.     Elyahou has misrepresented his ownership of Plaintiffs for the purpose of defrauding Plaintiffs and the other members or shareholders of Plaintiffs as well as those conducting business with Plaintiffs.

~~170.~~436.     Elyahou has engaged in illegal and fraudulent conduct towards the members of Plaintiffs, and has looted, wasted, or otherwise diverted for his own personal use the property and assets of Plaintiffs, thereby enriching himself at Plaintiffs' expense.

~~171.~~437.     Elyahou operated the business of the Plaintiffs in a manner to perpetuate his wrongful activities.

~~172.~~438.     Elyahou's actions jeopardize the Plaintiffs and put them and their members and/or shareholders at risk of criminal and civil liability.

~~173.~~439.     Elyahou's actions have harmed and will continue to harm Plaintiffs and the other members and/or shareholders of the Plaintiffs.

~~174.~~440.     Plaintiffs have no adequate remedy at law.

~~175.~~441.     Plaintiffs seek a permanent injunction restraining Elyahou from participating in the continued management and operation of the Plaintiffs.

**AS AND FOR THEIR FIFTEENTH CAUSE OF ACTION**
~~**AS AND FOR THEIR FOURTEENTH CAUSE OF ACTION**~~
**(Piercing the Corporate Veil-Against Elyahou)**

~~176.~~442.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~177.~~443.     Should it be found that Elyahou has legitimate ownership of the Plaintiffs, then the following concerning Elyahou and Plaintiffs are alleged.

~~178.~~444.     Elyahou failed to adequately capitalize Plaintiffs.

~~179.~~445.     Elyahou intermingled his personal assets with Plaintiffs.

~~180.~~446.     Elyahou used Plaintiffs' assets for his personal use.

~~181.~~447.     Elyahou, through his domination and control over Plaintiffs, abused the privilege of doing business in the limited liability company or corporate form to perpetrate a wrong or injustice such that a Court in equity will intervene by his actions in using Plaintiffs for his own personal purposes.

~~182.~~448.     Plaintiffs ~~seeks~~seek to pierce the veil of Plaintiffs and enter judgment against Elyahou for Plaintiffs' obligations.

**AS AND FOR THEIR SIXTEENTH CAUSE OF ACTION**
~~**AS AND FOR THEIR FIFTEENTH CAUSE OF ACTION**~~

**(Accounting)**

~~183.~~449.        Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~184.~~450.        Elyahou has engaged in illegal and fraudulent actions towards the members and shareholders of Plaintiffs and looted, wasted, and/or otherwise diverted for his personal use the property and assets of Plaintiffs, thereby enriching himself at Plaintiffs' expense.

~~185.~~451.        The exact amount(s) due Plaintiffs are presently unknown and cannot be ascertained without an accounting, because the information necessary to determine that amount is in the exclusive knowledge of Elyahou.

~~186.~~452.        Plaintiffs have no adequate remedy at law.

~~187.~~453.        Plaintiffs seek an accounting.

~~AS AND FOR THEIR SIXTEENTH CAUSE OF ACTION~~
AS AND FOR THEIR SEVENTEENTH CAUSE OF ACTION
**(Fraud –** Elyahou and Kassim**)**

454.        Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

~~All~~By reason of the foregoing. **Defendants**~~)~~

~~188.1.~~   Elyahou and Kassim, intentionally and knowingly engaged in ~~Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.~~

455.        ~~Defendants'~~ **fraudulent conduct** ~~in misrepresenting his business~~ by, among other conduct:

    (a)        Elyahou and Kassim lied about AutoExpo's financial condition;

    (b)        Elyahou fraudulently stole AutoExpo's trade secret and confidential and proprietary information;

    (c)        Elyahou made material misrepresentations about SimpSocial, such as that it was marketing in the "non-automotive market".

(d)     Elyahou made fraudulent material omissions about SimpSocial, such as that he even had an ownership interest in that entity;

(e)     Elyahou fraudulently stole AutoExpo's cash and fraudulently used its credit;

(f)     Elyahou and Kassim made fraudulent material omissions in failing to advise AutoExpo as to the cash collected from repo companies;

(g)     Elyahou made fraudulent material omissions about utilizing AutoExpo's bid information and supply that information to Certified Performance;

(h)     Elyahou, upon information and belief, made material misrepresentations to AutoExpo about his **interests** ~~proximately caused Plaintiffs~~in Certified Performance;

(i)     Elyahou and Kassim made material misrepresentations about their roles in connection with the Plan; and

(j)     Elyahou made material misrepresentations about AutoExpo supposedly approving amendments to the Plan, and actually falsified resolutions, resulting in, among other things, an unauthorized increase in compensation by reason of a company match in the Plan that was not properly authorized by the Company.

456.    Defendants Elyahou and Kassim engaged in the above fraudulent conduct, fraudulent concealment, and intentionally made the above-described false statements and material omissions in a calculated effort to steal from AutoExpo, induce AutoExpo not to act, and/or to conceal facts from AutoExpo.

~~189.~~457.    AutoExpo justifiably relied upon Defendants Elyahou and Kassim's above-described false statements and material omissions and as a proximate result, AutoExpo has suffered, and continue **to suffer, damages** in an amount to be established at trial, but in no event less than $10 million, plus interest and reasonable attorney's fees, all of **which** ~~are more fully set forth above.~~continue to accrue

~~190.~~458.    ~~All such losses~~In addition, all losses caused by Defendants Elyahou and Kassim's above-described fraudulent conduct and/or fraudulent concealment **were reasonably** foreseeable at the Defendants engaged in this conduct.

191,459.  As a result of Defendants' fraud, Plaintiffs have As a result of Defendants Elyahou and Kassim's fraudulent conduct and/or fraudulent concealment, Plaintiff AutoExpo has suffered, and continue to suffer, damages in an amount to be established at trial, but in no event less than $10 million, plus interest and reasonable attorney's fees, all of which continue to accrue.

460.    In addition, Defendants Elyahou and Kassim's fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiff AutoExpo to recover punitive damages.

### AS AND FOR THEIR EIGHTEENTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fraud-Against All Defendants Except Elyahou)

461.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

462.    By reason of the foregoing, SimpSocial, United Citizens, Certified Performance, Eitan, and Kassim have, individually and collectively, knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs by Elyahou.

463.    The acts taken by SimpSocial, United Citizens, Certified Performance, Eitan, and Kassim in furtherance of the fraudulent scheme perpetrated on Plaintiffs by Elyahou include, knowingly:

(k)    permitting Elyahou to lie about AutoExpo's financial condition;

(l)    permitting Elyahou to fraudulently stole AutoExpo's trade secret and confidential and proprietary information;

(m)    permitting Elyahou to make material misrepresentations about SimpSocial, such as that it was marketing in the "non-automotive market";

(n)    permitting Elyahou to steal AutoExpo's cash and fraudulently use its credit;

(o)    permitting Elyahou to make fraudulent material omissions in failing to advise AutoExpo as to the cash collected from repo companies;

(p)    permitting Elyahou to make fraudulent material omissions about utilizing

AutoExpo's bid information and supply that information to Certified Performance;

(q)     permitting Elyahou to make material misrepresentations to AutoExpo about his interests in Certified Performance;

(r)     permitting Elyahou to make material misrepresentations about his and/or Kassim's roles in connection with the Plan; and

(s)     permitting Elyahou to make material misrepresentations about AutoExpo supposedly approving amendments to the Plan, and actually falsified resolutions.

464.     Defendants SimpSocial, United Citizens, Certified Performance, Eitan, and Kassim knew that Elyahou engaged in the above fraudulent conduct, fraudulent concealment, and intentionally made the above-described false statements and material omissions in a calculated effort to steal from AutoExpo, induce AutoExpo not to act, and/or to conceal facts from AutoExpo.

465.     Defendants SimpSocial, United Citizens, Certified Performance, Eitan, and Kassim aided and abetted the fraudulent scheme in a calculated effort to conceal the scheme from AutoExpo.

466.     Defendants SimpSocial, United Citizens, Certified Performance, Eitan, and Kassim, individually and collectively, benefitted from their participation in Elyahou's scheme to defraud Plaintiff AutoExpo.

467.     By way of example, SimpSocial benefitted by charging exorbitant amounts to AutoExpo.

468.     By way of example, United Citizens benefitted by obtaining business opportunities that it knew compromised AutoExpo's competitive advantage

469.     By way of example, Certified Performance and Eitan, individually and collectively, benefitted from their use of trade secret, confidential, and proprietary inventory system and from utilizing AutoExpo's bid information.

470.     By way of example, Kassim benefitted by receiving preferences from Elyahou,

including an unauthorized increase in compensation by reason of a company match in the Plan that was not properly authorized by the Company.

471.     The extensive fraudulent conduct of Defendants SimpSocial, United Citizens, Certified Performance, Eitan, and Kassim, individually and collectively, demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiff AutoExpo to recover punitive damages.

472.     By virtue of the foregoing, Plaintiff AutoExpo has suffered, and continue to suffer, damages in an amount to be established at trial, but in no event less than $10 million, plus interest and reasonable attorney's fees, all of which continue to accrue.

## AS AND FOR THEIR NINETEENTH CAUSE OF ACTION
## ~~AS AND FOR THEIR TWENTY-FIRST CAUSE OF ACTION~~
### (Faithless Servant – Elyahou and Kassim)

473.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

~~192.1.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.~~

~~193.~~474.     Elyahou and Kassim were employed by Plaintiffs in positions of trust and confidence.

~~194.~~475.     As employees of Plaintiffs, Elyahou and Kassim owed Plaintiffs a duty of loyalty, honesty, and fidelity.

~~195.~~476.     By virtue of these duties, Elyahou and Kassim were prohibited from acting in a disloyal manner or in any way inconsistent with that trust relationship.

~~196.~~477.     Pursuant to the faithless servant doctrine, Elyahou and Kassim were obligated to be loyal to Plaintiffs and were prohibited from acting in a manner inconsistent with

their agency or trust and was bound to exercise the utmost good faith and loyalty in the performance of their duties.

~~197.~~478.     Elyahou's and Kassim's aforementioned conduct of soliciting Plaintiffs' customers and leads utilizing the confidential information they learned of through employment with AutoExpo to build Certified Performance (a competitor), while they worked for Plaintiffs using Plaintiffs' confidential information constitutes a breach of the fiduciary duty owed to Plaintiffs.

~~198.~~479.     Elyahou's and Kassim's activities were related to the performance of their duties.

~~199.~~480.     Elyahou's and Kassim's disloyalty permeated their services in its most material and substantial part.

~~200.~~481.     As a consequence of Elyahou's and Kassim's conduct, which constitutes a cause of action pursuant to the faithless servant doctrine, Plaintiffs have been injured, for which they are entitled to recover damages including but not limited to the return of wages, bonuses and other compensation paid to them such that they are disgorged of their wages and pay damages in the form of the financial loss, loss of good will and reputation, compensatory and special damages, interest, and punitive damages Plaintiffs suffered in an amount as the proof at a trial may warrant.

## AS AND FOR THEIR TWENTIETH CAUSE OF ACTION
### (Breach of Obligations Under ERISA – Elyahou and Kassim)

482.     Plaintiff AutoExpo incorporates by reference each of the foregoing allegations as though fully set forth herein.

483.     This cause of action is brought by AutoExpo pursuant to the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.

484.     Upon information and belief, AutoExpo established the Plan in 2006.

485.     The Plan is a defined contribution, individual account, employee pension plan under 29 U.S.C. § 1002(A) and § 1002(34).

486.     Prior to being removed as Trustee of the Plan, on or about May 22, 2024, Elyahou was Trustee of the Plan.

487.     Elyahou and Kassim, each, was, and acted as, a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), with respect to the funds contained in the Plan (the "Funds").

488.     As such, Elyahou and Kassim, each, had an affirmative obligation to discharge his/her duties solely in the interest of the participants and beneficiaries of the Funds in accordance with the Trust Agreements governing the Funds, pursuant to Section 404(a)(1)(D) of ERISA, 29 U.S.C. § 1104(a)(1)(D).

489.     As such, Elyahou and Kassim owed duties of care and loyalty to the Plan's Employer and participants, among others.

490.     Plaintiff AutoExpo, as the Employer who established the Plan and regularly exercises discretionary authority over the Plan and Fund management, has standing to bring this claim pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

491.     While serving as the named trustee, Elyahou was responsible for many duties, such as selecting and overseeing third party administrators of the Plan's account; controlling the release and disposition of the Plan's funds; and managing the Plan's performance.

492.     Pursuant to 29 U.S.C. § 1102(b)(3)a Plan shall provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan. Indeed, the Defined Contribution Plan Agreement contained this procedure which required a company board resolution to make any amendments. As a clear indication of Elyahou's knowing and willful

fraudulent intent. Elyahou drafted and executed a completely fraudulent Bogus resolution to amend the Plan to include provisions that serve his personal interests.

493.    Pursuant to 29 U.S.C. § 1104(a)(1), a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

494.    Elyahou and/or Kassim violated their fiduciary and other obligations under ERISA by, among other acts, purporting to amend the Plan, without authority, and falsely representing that AutoExpo's Board of Directors' approved such amendments; by purporting to authorize the April 2022 Withdrawal and/or House Payment from AutoExpo's 401(k) account at JP Morgan Chase, without authority, and in any event, without due consideration, and without complying with the applicable withholding and reporting obligations.

495.    Elyahou further violated 29 USCS § 1106 whereby "a fiduciary shall not in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."

496.    Upon information and belief, Elyahou orchestrated a malevolent scheme to evade taxes by using the 401(k) plan's funds to purchase his personal home.

497.    Elyahou's unilateral withdrawal of funds was not for the benefit of participants nor their beneficiaries.

498.    Elyahou directly violated 29 U.S.C. § 1106 by involving the Plan in a transaction to purchase real estate for his sole and exclusive benefit adversely exposing the plan and its participants to substantial tax liability.

499.     Pursuant to 29 U.S.C. § 1109, Elyahou is personally liable for an amount to be determined at trial of not less than the value of the funds Elyahou misappropriated, the costs associated with his breaches described herein, and restoration of any Plan profits Elyahou wrongly misappropriated, and to restore any Plan profits resulting from the allegations herein.

500.     By reason of the foregoing, AutoExpo is entitled to rescission of the April 2022 Withdrawal and an order requiring Elyahou to restore the amount of April 2022 Withdrawal to the Plan and/or take such other actions as are necessary.

501.     By reason of the foregoing Elyahou and Kassim are liable to AutoExpo for violations of 29 U.S. Code § 1106, 29 U.S. Code § 1105, 29 U.S. Code § 1104, ERISA 402(b)(3), 404 (a)(1)(D), 405, 406, 407, 409, 410, 502(a)(3), and 26 U.S. Code § 3405 (b) (1).

502.     By reason of the foregoing, Plaintiff AutoExpo is entitled to a surcharge against Elyahou and Kassim pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) as well as an award of reasonable attorneys' fees, costs and disbursements under Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1). The award of attorney's fees, costs and disbursements against Elyahou and Kassim is particularly justified to address the unnecessary expense that defendants' egregious actions have caused Plaintiff.

### AS AND FOR THEIR TWENTY-FIRST CAUSE OF ACTION
#### (Aiding and Abetting Breach of Obligations Under ERISA – Kassim)

503.     Plaintiff AutoExpo incorporates by reference each of the foregoing allegations as though fully set forth herein.

504.     Defendant Kassim was a longtime friend and trusted confidante of Elyahou.

505.     Kassim owed fiduciary duties to AutoExpo.

506.     Kassim owed fiduciary duties to the Plan.

507.     Kassim knew that Elyahou, although the "operating partner" running the day-to-

day operations of AutoExpo, was a minority shareholder, answerable to Shahkoohi and/or other shareholders who held the majority interests in Auto Expo as all times.

508.    Kassim knew that Elyahou owed fiduciary duties to AutoExpo.

509.    Kassim knew that Elyahou owed fiduciary duties to the Plan.

510.    As a direct result of Kassim's actions and her substantial assistance, Elyahou was able to violate his fiduciary obligations to AutoExpo and the Plan and was able to commit egregious violations of his duties under ERISA as set forth above.

511.    By reason of the foregoing, Kassim are liable to AutoExpo for aiding and abetting violations of 29 U.S. Code § 1106, 29 U.S. Code § 1105, 29 U.S. Code § 1104, ERISA 402(b)(3), 404 (a)(1)(D), 405, 406, 407, 409, 410, 502(a)(3), and 26 U.S. Code § 3405 (b) (1).

512.    By reason of the foregoing, Plaintiff AutoExpo is entitled to a surcharge against Kassim pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) as well as an award of reasonable attorneys' fees, costs and disbursements under Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1). The award of attorney's fees, costs and disbursements against Kassim is particularly justified to address the unnecessary expense that defendants' egregious actions have caused Plaintiff.

## DEMAND FOR JURY TRIAL

~~201.~~    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in its favor as against Defendants as follows:

a.    Awarding injunctive relief in returning their vehicles, confidential information, trade

secrets, and any other assets of Plaintiffs pursuant to 18 U.S.C. § 1836;

     b.   Injunctive relief restraining and enjoining Defendants from further violations of the DTSA, including the use of confidential information or trade secrets of Plaintiffs, and unfairly competing with Plaintiffs in any manner;

     c.   Injunctive relief restraining and enjoining Defendants from having any contact with Plaintiffs' current and/or former employees;

     d.   Compensatory damages for misappropriation of Plaintiffs' goodwill, misappropriation and unfair competition, violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, misappropriation, unfair competition, tortious interference with contract, business relations, and prospective economic advantage, conversion, civil conspiracy, professional malpractice, fraud, according to proof at trial, including but not limited to, lost profits, disgorgement of all profits and revenues received by Defendants, and – to the extent calculable – damages for reputational damage, lost customers, lost relationships, lost revenue, loss of goodwill, corrective advertising, and all other available damages;

     e.   Compensatory damages of at least $10,000,000.00 to the Plaintiffs;

     f.   Ordering that Defendants return all of Plaintiffs' confidential and proprietary information, including a forensic examination of all of Defendants' computing devices, cellular phones, and cloud storage sites;

     g.   Prohibiting the Defendants or their agents from selling vehicles to Plaintiffs' customers, whether directly or indirectly;

     h.   Declaring that Elyahou has no membership interest or shares in any of the Plaintiffs' corporate entities;

     i.   Punitive and exemplary damages in an amount to be determined at trial in this case;

j.     Interest (pre-judgment & post-judgment);

k.     Equitable relief in the form of the imposition of an injunction, constructive trust, accounting, and a disgorgement of profits and other benefits received by reason of the unlawful conduct complained of herein;

l.     Enjoining Defendants from operating their enterprise by virtue of their illegal conduct since they were created entirely through theft of Plaintiffs' businesses;

m.    Ordering that Defendants pay the costs of suit, including attorneys' fees; and

n.     Such other and further relief as this Court deems just, equitable, and proper.

Dated: Lake Success, New York
~~December 18, 2023~~September 23, 2024                          Respectfully submitted,

**MILMAN LABUDA LAW GROUP PLLC**

/ s

~~Michael C. Mulè~~*Mulé*
Michael C. Mulé, Esq.
~~Emanuel Kataev, Esq.~~
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
michaelmule@mllaborlaw.com
~~emanuel@mllaborlaw.com~~

*Attorneys for Plaintiffs*
*AutoExpo Ent Inc.,*
*Peace Properties LLC*
*Network Reinsurance Company Inc.*
*Auto Exchange Center, LLC, and*
*Chrome Insurance Agency LLC*